**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

BLOOMFIELD INVESTMENT
RESOURCES CORP.,

                                                              Plaintiff,

                    -against-

ELLIOT DANILOFF,

                                                              Defendant.

---

No. 1:17-cv-4181

**COMPLAINT**

**(JURY TRIAL DEMANDED)**

## Table of Contents

Page

NATURE OF THE ACTION .................................................................................1

JURISDICTION AND VENUE ...........................................................................5

PARTIES...............................................................................................................5

OTHER RELEVANT INDIVIDUALS AND ENTITIES.....................................5

FACTUAL BACKGROUND ................................................................................6

A.    Daniloff's Representations Induce Bloomfield to Loan $25 Million to
      UMG .............................................................................................................6

B.    Daniloff Fails to Deposit the Loan Proceeds into the ING Account Per
      His Representations to David Reuben ........................................................12

C.    Daniloff Improperly Spent the $25 Million Without Bloomfield's
      Consent .......................................................................................................13

      1.    Daniloff Misappropriated the Funds Immediately Following the
            Original Transfer in 2011 ...................................................................13

      2.    Daniloff Continued to Use the $25 Million Without
            Bloomfield's Consent..........................................................................15

      3.    Even After Raising More Capital, Daniloff Failed to Pay
            Bloomfield Back and Continued to Improperly Use UMG's
            Money...................................................................................................17

            a)    $6 Million in Broker Fees .........................................................18

            b)    $5.4 Million to the Synergy Funds ...........................................18

            c)    Payments to APK and Hudson River.........................................19

            d)    Deposits in Razvitie Bank.........................................................20

D.    These Expenditures, and Daniloff's Explanations of Them,
      Demonstrate he Never had any Intention of Paying Bloomfield Back .........22

E.    Daniloff Confirms His Understanding that He Must Re-Pay
      Bloomfield's Loan by Negotiating Myriad Forms of Repayment, Each
      of Which He Fails to Honor .......................................................................23

      1.    August 2013: Daniloff's Promise of Repayment Negotiated
            with Jamie Reuben ..............................................................................24

2.  March 2014: Daniloff's Promise of Repayment After Capital Injection ...................................................................25

3.  July 2014:  Daniloff Promised Repayment Via Negotiation with Saydam .....................................................................27

4.  September 2014:  Daniloff Promises Repayment to David Reuben .......................................................................28

5.  October 2014:  Daniloff Promises Repayment by the End of 2014 ...........................................................................28

6.  November 2014:  Daniloff Promises Partial Repayment of $15 Million, Followed by Repayment of the Other $10 Million ..............29

7.  Daniloff Executes the November 26, 2014 Agreement to Repay Bloomfield ..................................................................30

8.  Daniloff Breaches the November 26, 2014 Agreement to Repay Bloomfield ..................................................................31

9.  Late 2014–Early 2015: Daniloff's Additional Promises to Re-Pay Bloomfield ...............................................................32

F.  Daniloff Finally Deposits Only $15 Million of the $25 Million Loan into the DHB Account, But Refuses to Release the $15 Million to Bloomfield ...................................................................34

G.  The Attachment Proceeding ....................................................36

1.  Bloomfield Commences the Attachment Proceeding .........................36

2.  Daniloff Suddenly Claims that He is Not Required to Return the $25 Million to Bloomfield................................................37

3.  UMG and Bloomfield Execute an Escrow Agreement.......................38

H.  Other Subsequent Proceedings ................................................39

1.  The Dutch Plenary Action...................................................39

2.  The ED Capital Action .....................................................39

CLAIMS FOR RELIEF ..................................................................40

JURY TRIAL DEMAND .................................................................43

Plaintiff Bloomfield Investment Resources Corp. ("Bloomfield"), by its attorneys, Reed Smith LLP, as and for its complaint against Defendant Elliot Daniloff ("Daniloff"), respectfully alleges as follows:

## NATURE OF THE ACTION

1.      This case involves the fraudulent acts of Defendant, Elliott Daniloff, who deceived and manipulated Plaintiff Bloomfield in order to effect a scheme to steal $25 million to—purportedly—develop a poultry farm in Russia.

2.      Daniloff crafted a plan to raise money for the creation of a poultry production operation—Open Stock Company United Meat Group ("UMG")—in the Republic of Bashkortostan, Russia.  UMG was to operate a vertically integrated poultry farming complex, which included a broiler farm as well as grain production and storage facilities.  Daniloff projected that the project would yield 3.2 billion RUB (approximately $56 million) in gross profits after five years, with an internal rate of return of 29%.

3.      Toward that end, Daniloff exploited the good will of his close friends Alex Bendersky and Arkadiy Orkin by convincing them to introduce him to David Reuben, a successful businessman residing in England and one of the ultimate beneficial owners of Bloomfield, in order to obtain financing for his scheme.

4.      Daniloff represented that he was in need of capital that he could put on the books of UMG so that it could raise further capital from various potential funding sources, including certain Russian banks, and obtain valuable subsidies from the Russian government.  Daniloff initially told this to Bendersky and Orkin, and subsequently expressed this objective to Bloomfield's representatives numerous times.

5.      As a result of Daniloff's persistence, Daniloff was introduced to David Reuben. David Reuben advised Daniloff that he had no interest in purchasing an equity stake in UMG because he had no familiarity with the poultry business, and no longer made investments in Russian businesses.  Daniloff's representations, however, concerning the opportunity, and, in particular, the ability to potentially obtain valuable government subsidies, caused David Reuben to consider a loan under certain restrictive terms.

6.      At all times, Daniloff presented himself credibly and professionally and David Reuben had no reason to detect that the information Daniloff presented was fraudulent or false.

7.      After numerous assurances by Daniloff concerning the nature of the business, and the fact that the investment would not be the purchase of an equity stake, Bloomfield agreed to *lend* Daniloff $25 million in late 2011 under the express conditions, as detailed by Daniloff, that: (i) Bloomfield would be paid back within two and a half years (*i.e.*, no later than the end of 2013); (ii) the $25 million would be held in escrow and remain unused absent Bloomfield's express consent; (iii)  Bloomfield would retain signatory control over any disbursements from the escrow account; (iv) Bloomfield would be permitted to appoint a director to UMG; and (v) Bloomfield would receive a 50% ownership interest in UMG that would be reduced to 25% once the loan was repaid.  The nature and terms of this arrangement were confirmed both before and after the loan was ultimately made.

8.      After initial agreement to these terms, Daniloff convinced Bloomfield that the money had to go to UMG via his fund because, as he explained, "it's better from a security and prying eyes perspective that the money comes from a fund rather than from any individual or recognizable person."  Although hesitant at first, David Reuben ultimately agreed.

9.     Thus, Daniloff fraudulently induced Bloomfield to deposit the $25 million through his Synergy Funds.  Importantly, Daniloff represented that the deposit of the money via the Synergy Funds would not in any way change the nature of the agreement or the terms of the loan.

10.     Despite his representations to the contrary, Daniloff had no intention of returning the $25 million.  After Bloomfield transferred the money to the Synergy Funds, Daniloff also did not place the funds in escrow, or provide Bloomfield with signing authority.  Daniloff surreptitiously funneled the money to a Russian bank account that only Daniloff controlled. From there, Daniloff transferred the loan proceeds to entities controlled by Daniloff and his family members for their own personal gain.

11.     As the 2013 deadline for repayment of the loan drew near, Daniloff was asked about the details of its expected return.  Daniloff, continuing his fraud, repeatedly assured Bloomfield that Daniloff planned to "return the initial investment" by the end of 2013, "as was agreed with David [Reuben]."  That was a lie, and the money was not returned.

12.     The deception continued after the repayment date as Daniloff continually assured Bloomfield throughout 2014 and into 2015 that the money would be imminently returned.  This, too, did not happen.  Instead, Bloomfield subsequently learned that, without Bloomfield's authorization, Daniloff:  (1) continued to transfer money to entities with which he had substantial familial or financial connections; (2) deposited money with risk-laden banks in Russia without any business rationale or fair explanation; and (3) failed to even provide detailed and accurate bank statements detailing where he transferred the money.  Ultimately, Daniloff repaid only $6.5 million of the $25 million loan.

13.     After relying on a long string of lies and false assurances by Daniloff, in June 2015 Bloomfield commenced legal proceedings in the Netherlands against UMG to levy prejudgment attachment by garnishment on a Dutch bank account held by UMG at Demir-Halk Bank in the Netherlands where Daniloff had transferred monies that he represented would be used to repay Bloomfield.

14.     Through these proceedings, Daniloff's fraudulent scheme was more fully revealed.  Caught red-handed after years of deception, Daniloff—for the first time—recast his story about the nature of the agreement with Bloomfield.  He claimed that the money could only be returned via a "redemption from the Synergy Funds."  At no time prior to this did Daniloff dispute the terms of $25 million **loan**.  In fact, Daniloff had consistently confirmed those terms into 2015.

15.     Bloomfield was, at all relevant times, unaware of Daniloff's fraud, or more generally, the alleged nature of Daniloff's business affairs.  Recently, Daniloff's investment management company, ED Capital Management ("ED" stands for Elliot Daniloff), was reported to be linked to a multi-billion dollar money laundering scheme in Russia dubbed "the Laundromat."  ED Capital Management manages the Synergy Funds.  The Laundromat allegedly involved obtaining fraudulent judgments in Moldovan courts arising out of sham contracts in Russia, and disbursing the funds paid to satisfy those "judgments" throughout the world.  The Organized Crime and Corruption Project lists ED Capital Management as one of the entities that "spent, channeled, or ended up with the Laundromat money," and details ED Capital Management's receipt of $179,999 in money transfers from "a company active in the Laundromat."

16.     Bloomfield brings this action to recover the unpaid portion of its $25 million loan.

## JURISDICTION AND VENUE

17.    This Court has diversity jurisdiction over the parties pursuant to 28 U.S.C. § 1332(a)(2) because this dispute is between a citizen of a State and a citizen or subject of a foreign state and the amount in controversy exceeds $75,000, exclusive of interest and costs.

18.    Bloomfield is a citizen of the foreign state of the British Virgin Islands and Daniloff is a citizen, resident, and domiciliary of the State of New York.

19.    Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(b)(2) because "a substantial part of the events or omissions giving rise to the claim occurred" in this district.

## PARTIES

20.    Bloomfield is a company organized and operating under the laws of the British Virgin Islands with its principal place of business located at 9 Place du Molard, 1204 Geneva, Switzerland.

21.    Daniloff is a United States citizen and a resident of the State of New York. Daniloff owns and resides in the property located at 11 Coleridge Street, Brooklyn, New York, 11235-4105.

## OTHER RELEVANT INDIVIDUALS AND ENTITIES

22.    David Reuben and his brother Simon Reuben (together, the "Reuben Brothers") are investors in private equity, real estate investment and development, and venture capital.

23.    Daniloff is the sole principal of ED Capital, LLC ("EDC"). Daniloff is also an owner and director of ED Capital Management, LLC ("EDM," and together with EDC, the "ED Capital Entities"). The ED Capital Entities have their principal places of business in New York City.

24.     EDC is the investment advisor and EDM is the investment manager of the off-shore funds referred to as the Synergy Hybrid Feeder Fund Ltd. ("Feeder Fund") and Synergy Hybrid Fund Ltd. ("Master Fund," and together with the Feeder Fund, the "Synergy Funds"). Daniloff is also a director of the Synergy Funds.

25.     UMG is a Russian company founded in 2009.  UMG is in the business of poultry, grain and animal feed production.  UMG is wholly-owned by the Master Fund.  According to UMG's audited annual reports, Daniloff is the "ultimate controlling party" of UMG.  Daniloff has an e-mail address at UMG.

26.     UMG has four subsidiaries:  (i) ZAO Bashkirskiy Broiler ("Bashkirskiy Broiler") (was responsible for managing, and creating the infrastructure for, poultry production); (ii) ZAO Khlebnaya Baza 67 (stores grain and produces animal feed); (iii) ZAO Bashkirian Grain Company (produces grain); and (iv) ZAO Raevskiy Elevator (stores grain).

27.     UMG is also a shareholder in JSC Agro-Industrial Complex "Maximovsky" ("APK").  APK is a pig farming and pork production company.  Both Daniloff and his brother, Igor Daniloff, are on APK's board of directors, and Igor Daniloff serves as APK's Chief Executive Officer.

28.     Upon information and belief, Hudson River Master Fund Ltd. ("Hudson River")—which EDM manages and for which Daniloff previously served as a director and officer—is also a major shareholder of APK.

## FACTUAL BACKGROUND

**A.     Daniloff's Representations Induce Bloomfield to Loan $25 Million to UMG**

29.     In the summer of 2010, Daniloff approached his longtime friend Alex Bendersky ("Bendersky") regarding Daniloff's need for financing in connection with a Russian business

project on which he was working.  Bendersky arranged a meeting between Daniloff and

Bendersky's father-in-law, Arkadiy Orkin ("Orkin"), a successful businessman, to discuss

Daniloff's project.

30.     During that meeting, Daniloff described UMG and his goal to create a fully-

integrated poultry production company.  Daniloff advised Orkin that he needed an initial infusion

of outside capital, as he sought to obtain financing from Sberbank or RosAgroBank, two Russian

banks, as well as subsidies from the Russian government (including an allocation of land for use

and development).  Daniloff was thus looking for a financially strong party to provide such an

initial, short term loan to UMG, through Bashkirskiy Broiler.

31.     Following the meeting between Orkin and Daniloff, Orkin told David Reuben that

Daniloff was well-educated and had been previously employed by top US financial firms.  Orkin

also explained that Daniloff had "successfully organized [a] hedge fund for business in

Russia . . . with involvement of American investors . . . in [the] range of USD $100 mill" and

that Daniloff already operated established farms and had a "solid" reputation and connections

with local government.

32.     David Reuben agreed to meet with Orkin and Daniloff in late 2010 at David

Reuben's offices in Millbank Tower, Westminster, London.  At this meeting, Daniloff asked

David Reuben to **_invest_** $10-15 million in UMG.  David Reuben stated that he had no interest in

investing in UMG because he had no familiarity with this type of business and no longer made

investments in Russian businesses.

33.     As a result, at that same meeting, Daniloff instead requested that David Reuben

**_loan_** $25 million to UMG.  Daniloff explained that the money would be placed in escrow and

would assist him in obtaining other financing and subsidies.

34.     At this meeting—which lasted nearly an entire business day—Daniloff laid out the terms of the loan.  *First*, Daniloff represented that the money would remain in a restricted bank account over which Bloomfield would retain signatory control.  *Second*, UMG would not use the money unless authorized by Bloomfield.  *Third*, Daniloff represented that the $25 million would be paid back in two and a half years (*i.e.*, no later than the end of 2013).  *Finally*, Daniloff stated that, in return for the loan, David Reuben would receive a 50% ownership interest in UMG and, once the loan was repaid, would retain a 25% ownership interest in UMG.  Orkin would also receive a 25% interest in UMG once the loan was repaid.  This agreement was confirmed numerous times.

35.     After these terms were agreed upon, Daniloff advised that the $25 million had to be provided to UMG via deposit through the Synergy Funds.  Daniloff explained that this was necessary to avoid scrutiny from the Russian government.  Daniloff stated in words or substance that:  "[I]n Russia it's better from a security and prying eyes perspective that the money comes from a fund rather than from any individual or recognizable person . . . . [As] in such a case a Russian bank funding the company may request a personal guarantee of such person.  As a fund it becomes anonymous."

36.     Initially, David Reuben rejected this proposal, as it was not the type of investment he normally made or was comfortable making.  However, Daniloff assured David Reuben repeatedly that the deposit of monies into the Synergy Funds did not alter the agreement being discussed, and that, among other things, the monies were a loan to UMG to be repaid in full within two and a half years.  Indeed, Daniloff later testified that he described this business opportunity to David Reuben as an investment in UMG, not in the Synergy Funds:  "I told him,

David Reuben, there was a chance to invest in the . . . development of a vertically integrated chicken production business in Russia."

37.     A number of follow-up meetings took place in early 2011.  Meetings to discuss the project were held in the offices of one of David Reuben's companies on or about May 18, 2011 and May 19, 2011.  Orkin, Daniloff and Mel Wilde, another Reuben Brothers' employee, and a representative of Bloomfield, were present at both meetings.  David Reuben joined the May 18 meeting.  During these meetings, Daniloff reiterated the terms of the loan.  He also touted his strong experience navigating the Russian market and expressly stated that the money would be a loan and "not an actual investment," and that the money would not be used for any "risky" transactions.

38.     On July 6, 2011, Daniloff emailed Wilde a summary of the proposed loan. Contrary to David Reuben's prior discussions with Daniloff, in this communication, Daniloff described the loan as being for *both* the broiler business and APK, the latter of which, after three years of operations, "has a small number of investors who would like to exit the project at discount due to liquidity reason" that "[they] would need to buy out first."

39.     On July 7, 2011, Wilde advised Daniloff that he did not want to include the APK investment in the presentation to David Reuben because it "doesn't look good to a new investor that after three years investors want to move."  Wilde suggested concentrating solely on UMG, to which Daniloff readily agreed.

40.     On July 14, 2011, David Reuben wrote Alexander Bushaev ("Bushaev"), an employee of the Reuben Brothers and future sole director of Bloomfield, and described the project as follows:

> There is a proposal to enter into 25 pct partnership with a group by
> Arkadi working on a project of producing poultry in Bashkiri.  The

local banks and govt agrees to sell us hundreds of thousands of acres at nominal amount to creat[e] farms to produce feed.  There. Are two existing silos to store .  For this they require 25m funds ***to show as equity altho [sic] given as loan and any dusbursements [sic] to be monitored by us.***  I want you to meet Eliot who runs this along with aherkadi perhaps visit the site come up with a realistic relationship to work under.  The values shows the money will be paid back within months.  We remain at 25 pct and they today value project at 5 or 6 hundred million profit on completion where we stay with returns or ipo.  (emphasis added).

41.    On July 30, 2011, David Reuben, Jamie Reuben (David Reuben's son) and Daniloff met again—this time in St. Tropez, France.  At that meeting, Daniloff again presented the terms of the proposed loan, which Orkin recounted in an affidavit:  "During [that] meeting . . . Daniloff and David Reuben agreed on making the formal investment, actually a loan/kind of deposit that would stay under restricted bank account.  The conditions were very clear.  Daniloff knew that he could not touch the money without the approval of David Reuben."

42.    At this time, Daniloff also agreed that Reuben would be permitted to appoint a director at UMG.  In an email to Bushaev, dated August 24, 2011, David Reuben stated:  "I have to appoint a director who is charge of an investment loan . . . .  The money is a loan . . . [that will be] returned back to us.  Alex [Bushaev] should be the director.  He and Arkadiy will supervise the funding of the whole group."

43.    In furtherance of the agreement and Daniloff's representations concerning the same, on August 31, 2011, a special purpose vehicle, Bloomfield, was created for the purpose of lending the money to UMG.

44.    On September 8, 2011, Daniloff sent Ben Webb and Patrick O'Driscoll, employees of Motcomb Estates Ltd. (an advisor to the Reuben Brothers) and representatives of Bloomfield, a presentation providing an overview of the project.  Among other things, the presentation detailed that the $25 million from Bloomfield would flow through the Synergy

Funds to the ultimate benefit of UMG, and that the project would yield 3.2 billion RUB

(approximately $56 million) in gross profits after five years, with an internal rate of return of

29%.

45.     Pursuant to the agreement between Daniloff and David Reuben, on September 14,

2011, Webb emailed Gennady Zalko, the managing director at EDM, and UMG's Chief

Executive Officer, and stated:  "[i]n order for us to invest, we will require that we become

signatories on the bank accounts so that expenditure is controlled with our authorization."  Webb

copied Daniloff on this correspondence.

46.     In response, on September 16, 2011, Zalko replied, again copying Daniloff:  "ING

Bank Eurasia can provide such services to us [whereby] [t]he use of cash by . . . [the] company is

approved by [David Reuben]."

47.     As a result, on or about October 7, 2011, Zalko purported to open an account with

ING Bank in Moscow, Russia (the "ING Account"), where the $25 million was supposed to be

deposited, and over which David Reuben would retain complete control, with Webb as

Bloomfield's signatory.

48.     Consistent with Daniloff's representations that the $25 million had to be provided

to UMG via the Synergy Funds, Daniloff advised Reuben that he must execute a Subscription

Agreement to the Synergy Funds.  Therefore, on November 3, 2011, David Reuben caused

Bloomfield to do so.  Days later, on November 11, 2011, Bloomfield transferred $25 million to

the Synergy Funds with the expectation that the money would immediately be transferred to the

ING Account (the "Original Agreement").

49.     Indeed, before, during, and after this transfer, Daniloff continuously and

consistently represented that (i) the deposit of monies in the Synergy Funds did not alter the fact

that the $25 million was a loan to UMG and (ii) that the monies would immediately be transferred into the ING Account, over which Bloomfield would have signatory control.

50.     Bloomfield relied on Daniloff's representations in making the loan in light of, among other things, the restrictive terms of the loan, the ability to control the funds, Daniloff's finance background, Daniloff's financial projections for the project, and Daniloff's assurances that his project would be subsidized by the Russian government.

51.     However, as discussed in more detail below, Daniloff had no intention of returning the $25 million.

**B.     Daniloff Fails to Deposit the Loan Proceeds into the ING Account Per His Representations to David Reuben**

52.     Shortly after the original deposit was made, on January 24, 2012, Webb emailed Daniloff seeking to confirm that the terms of the deal were being honored:  "As previously discussed[,] can you confirm that the funds will be transferred to the ING bank account opened for this business.  No amount should be committed unless David [Reuben] agrees the spend in advance."

53.     Daniloff replied to Webb on the same day, copying Zalko, confirming that the money would be transferred:  "I confirm that the funds will be transferred to the ING bank account."

54.     Three months later, Webb again sought confirmation from Daniloff about the transfer of monies to the ING Account.  In an email to Daniloff, dated April 19, 2012, copying Zalko, Webb wrote:  "Dear Elliot Could you please provide me with an update on the cash.  I have not had anything from ING regarding the funds, can you please confirm that they are in the ING account and whether there is any statement or anything for this."

55.     Daniloff replied that same day, copying Zalko, asking: "Have you received email form [sic] Gennady (Zalko) with balances as of the end of the February and March? If not, give me a couple of days to reply."

56.     Later that same day, Zalko added in an email to Webb and Daniloff: "Attached you find an update on OMC (UMG) balance sheet March, 31st. . . .  Please note, that neither deposit accounts nor bank's interest bearing notes are[] reflected on the ING report." With this statement, Zalko further represented that deposit accounts at ING existed, but were not reflected in the report.

57.     Webb responded to Zalko's email on April 19, 2012: "So can you please explain the use of the $25m transferred, as it should be in the ING account as discussed . . ."

58.     Neither Daniloff nor Zalko responded to that email for a week. Finally, on April 23, 2012, Daniloff revealed for the first time to Webb that the $25m "sit[s] on deposit in Sberbank[,]" a bank account in Russia over which David Reuben had no control.

59.     Thus, despite Daniloff's and Zalko's repeated assurances that the $25 million would be transferred to the ING Account, the money was instead deposited, without Bloomfield's consent, into an account at Sberbank over which Bloomfield had no signatory control.

**C.      Daniloff Improperly Spent the $25 Million Without Bloomfield's Consent**

       **1.      <u>Daniloff Misappropriated the Funds Immediately Following the Original Transfer in 2011</u>**

60.     Despite his representations that the $25 million would be placed in the ING Account and used only with Bloomfield's consent, Daniloff used the money at his discretion and without Bloomfield's permission, including to fund his own personal interests, to the detriment of UMG and Bloomfield.

61.     On January 24, 2012, Daniloff emailed David Reuben, among others, laying out how he intended to use the $25 million, which included depositing money at "Sberbank or ING at an approximate interest rate of 2.0%," investing in short-term notes at Russian banks, and investing in Eurobonds.  David Reuben immediately replied, stating that he did "not want the funds used the way you explain it," and indicating that he did not want any of the money placed in Russian banks due to low expected returns.  Daniloff replied to David Reuben on January 24, 2012: "Ok, will do."

62.     On March 2, 2012, Zalko sent Webb and O'Driscoll an email detailing UMG's financial situation.  He noted that the Synergy Funds invested approximately $4.5 million as equity in UMG and loaned another $20 million to UMG.  The $20 million loan was allocated as follows:  (i) $10.5 million on deposit at Sberbank; (ii) $9 million into Sberbank U.S. Dollar-denominated commercial paper; (iii) 22 million RUB into Sberbank Ruble-denominated commercial paper; and (iv) $300,000 cash remaining on its current account.

63.     This allocation—if even accurate—was in direct contravention of David Reuben's January 24, 2012 instruction not to place money into any Russian banks, as well as the Original Agreement, under which the money was not to be used absent Bloomfield's consent.  Daniloff purposefully deposited the money into Sberbank so that he could have unfettered access to the funds, in direct violation of his representations and his agreement with Bloomfield.

64.     At the same time, unbeknownst to Bloomfield, UMG was being terribly mismanaged and was in dire financial trouble.

65.     In August 2012, UMG was at risk of losing the land provided to it by the Russian government because Daniloff had failed to take any efforts to develop the land.  In that regard, on August 7, 2012, Malou Skeel, a UMG executive, emailed Daniloff, Zalko and Orkin stating:

> [T]he local administration in Ufa is questioning our (read YOUR) intentions.  They can see that nothing has been done in terms of getting machinery ready etc.  And I understand that they are threatening to take back the land if we are not going to do anything.  Sorry, Gentlemen, but seems that there is still today a total lack of understanding from your side of the urgency in getting things moving if we want to start treating the land now.  We have been saying for a long time now, we are RUNNING OUT OF TIME, but you just don't want to acknowledge it.  In a few days, it will all be TOO LATE!

66.     In fact, from receipt of the $25 million in late 2011 through the end of 2013, Daniloff caused UMG to participate in numerous questionable transactions.  For example, Daniloff wired hundreds of thousands of dollars to entities in which either he, or his family members, had a direct pecuniary interest.

67.     Skeel again emailed Daniloff on August 17, 2012 relaying that Torben, an agronomist working under Skeel, had been told by a leasing company that the latter "cannot fully understand the management structure of your company [UMG]. . . . it's not clear who makes decisions and who is responcible [sic] for implementation.  For us this uncertainty is also a risk – 'managerial'."  Skeel noted in the same email that:  "The way we are working now cannot continue as nothing gets done and we end up not being able to keep our promises to anyone and upsetting a whole range of people, companies (both private and official)!"

68.     Thus, it is clear that the $25 million was not only being used absent Bloomfield's consent, but also was not being used to the benefit of UMG.

**2.     Daniloff Continued to Use the $25 Million Without Bloomfield's Consent**

69.     In mid-2013, David Reuben asked his son, Jamie Reuben, to investigate the whereabouts of the $25 million and the financial position of UMG.

70.     On July 2, 2013, Jamie Reuben spoke to Daniloff via telephone, and then recounted his conversation in an email that same day, stating that, according to Daniloff, the $25 million loan had been allocated as follows:

a.     $7 million into bank deposit at 2.5% interest.

b.     $6 million into agriculture land project.

c.     $7 million as a loan for infrastructure.

d.     $1.25 million into Daniloff's pig farming operation [APK].

e.     $3 million amortization of the loan.

f.     $500k for fees, consultants, etc.

71.     In response to this report from his son, David Reuben replied to Jamie Reuben, copying Daniloff, on July 3, 2013:  "I did not authorize this as detailed. . . . This is the first I know of detailed where the 25 m is because I had this impression that most of the money is in escrow."

72.     It is clear that Daniloff never intended to adhere to the Original Agreement and seek Bloomfield's consent prior to using the money.  On July 12, 2013, Jamie Reuben emailed Daniloff, asking him for a detailed breakdown of where the $25 million loan had been spent to date.  Daniloff responded on August 1, 2013, providing a breakdown of the $25 million largely consistent with the breakdown in Jamie Reuben's July 2, 2013 email.  Daniloff wrote:

a.     $6m in short term bank notes.  These notes are used as collateral for Sberbank loan of $20m for 30m egg breeding farm.

b.     $6m used for Bashkirian Grain Company to operate 18,000 hectares of land.

c.     $7.5m allocated to construct utilities infrastructure for 30 million egg breeding farm.

d.     $1.25 million was used to buy a 10% stake in APK.

e.     $3 million was used to pay down a 100m RUB loan at the silo.  Two silos are used as collateral for Sberbank loan of $20m for 30 million egg breeding farm.

f.      $1.25 million was used for the Bashkirian Broiler project.

**3.      Even After Raising More Capital, Daniloff Failed to Pay
Bloomfield Back and Continued to Improperly Use UMG's
Money**

73.      Daniloff raised $70 million from the issuance of notes by UMG's subsidiary,

UMG Finance B.V., via note issuances on December 17, 2013, January 27, 2014 and December

3, 2014.

74.      Even after Daniloff raised an additional $70 million in financing, Daniloff still

continued to mismanage UMG's money and line his own pockets.

75.      At the time of each note issuance, Daniloff advised Bloomfield that the proceeds

would be used, in part, to pay the $25 million loan back to Bloomfield.

76.      Contrary to his representations, Daniloff did not return any money to Bloomfield.

Instead, after the issuance of the first two tranches of notes ($40 million) in December 2013 and

January 2014, Daniloff spent the money as follows, and absent any authorization from

Bloomfield or David Reuben:

a.      $6 million in broker fees related to the issuance of the notes;
b.      $5.4 million to the Synergy Funds;
c.      At least $2.3 million to three of Daniloff's other companies, one of which
was APK.
d.      $500,000 to Hudson River, another fund managed by Elliott Daniloff with
no clear business relation to UMG .
e.      Over $25 million in small Russian banks, including $20 million on deposit
with Razvitie Bank, whose owner is Daniloff's close personal friend and
was ranked 274th in terms of assets among all Russian banks.

77.      Neither Bloomfield nor David Reuben were consulted about nor approved of the

use of the proceeds in this manner—particularly given that the $25 million loan from Bloomfield

had to be repaid at that time out of the proceeds.

### a) *$6 Million in Broker Fees*

78.     The $6 million in broker fees paid in connection with the first two bond offerings is an exceptionally high amount (15% of the face value of the notes issuance).  Daniloff has never provided to Bloomfield any explanation of why this fee was so high.

### b) *$5.4 Million to the Synergy Funds*

79.     Upon information and belief, the $5.4 million allocated to the Synergy Funds was used to fund Daniloff's personal luxury expenses.

80.     For example, Daniloff spent $150,000 on a five-day trip to Dubai.  This spending was excessive and without a legitimate business purpose.  In fact, in a December 1, 2014 e-mail, Daniel Gould ("Gould"), UMG's former Deputy Chief Executive Officer and Financial Controller, explained to Saydam that "[D]ubai is the global center for money being **recycled** in this way . . . ie you go to a restaurant and agree that the dinner will cost 50k, of which 45k you will receive in an envelope upon leaving the restaurant." (emphasis added).  Gould stated that he "spoke with a senior banker who headed a large foreign bank there and he said that this is a 'classic' trick for laundering money."

81.     Also, in *addition* to nearly $2.5 million in payment of management fees to EDM, the Synergy Funds had made the following questionable expenditures:  (i) a $191,000 payment designated "personal to Elliot Daniloff"; (ii) a $180,000 "educational loan"; (iii) nearly $250,000 in "travel/conference" expenditures; and (iv) $205,000 in American Express charges (exclusive of travel).  These expenses were purely to fund Daniloff's extravagant lifestyle and did not serve any legitimate UMG-related purpose whatsoever.

82.     Indeed, EDM was recently reported to have been involved in fraudulent schemes in Russia.  In a March 22, 2017 article titled "Probes Show How Russian Money Travels the World," Barron's linked EDM to a billion dollar Russian money laundering scheme dubbed "The

Laundromat."  The scheme works as follows:  A Russian company guarantees the debts owed

under sham loan agreements entered into between two shell companies.  After the borrower

defaults, the lender sues the Russian guarantor in a Moldovan court, which would, in turn,

"certify" the debt and require the guarantor to transfer money to a bank in the European Union to

satisfy the debt.  Moreover, the Organized Crime and Corruption Project lists EDM as one of the

entities that "spent, channeled, or ended up with the Laundromat money" and specifically details

EDM's receipt of $179,999 in money transfers from Crystalord Ltd., "a company active in the

Laundromat."

### c) *Payments to APK and Hudson River*

83.     During this time, Daniloff has resisted all efforts to provide Bloomfield with

copies of UMG's bank statements, as requested.  Bloomfield had to rely on the *ad hoc* financials

provided by Daniloff, which are replete with additional apparent sham transactions.  For

example, Daniloff transferred millions of dollars to entities with which he was affiliated in

connection with purported services, which, upon information and belief, were never performed.

84.     In addition, it appears that Daniloff transferred, directly or indirectly, at least $2.3

million to APK, including (i) $1.2 million and $1.16 million to purchase APK shares in 2012 and

2013, respectively, and (ii) 6 million RUB (approximately $100,000) to TD Mega, APK's

authorized sales agent.

85.     There was no legitimate business purpose for the money transfers to APK.  They

were simply designed to salvage that business, which was contemplating bankruptcy as early as

June 2013.  Rather, Daniloff was seeking to protect his personal pecuniary and familial interests;

his brother Igor Daniloff serves as APK's Chief Executive Officer, Daniloff is a member of

APK's Board of Directors and, upon information and belief, Hudson River is a shareholder of

APK.

86.     Not surprisingly, Daniloff's unlawful activities resulted in a lawsuit against him by minority shareholders of APK.  NKV Investments Ltd., a 9.47% shareholder in APK, asserted in the lawsuit against Daniloff in the Arbitration Court of the Republic of Bashkortostan that Daniloff was concealing the true state of APK's affairs and refused to provide NKV with key financial documents.  In December 2013, that Court sided with the minority shareholders, holding that there was no basis for Daniloff to keep NKV in the dark about the state of APK's affairs.

87.     In addition, on March 1, 2012, Daniloff caused UMG to receive a 26,500,000 RUB (approximately $463,700) loan from Hudson River, which, as discussed above, is a hedge fund for which Daniloff served as an officer and director.  Rather than pay Bloomfield's loan back as promised—for example on May 19, 2014 and July 15, 2014—Daniloff prioritized his own pecuniary interest and repaid Hudson River 29,281,645 RUB (approximately $512,448).

### d) *Deposits in Razvitie Bank*

88.     Echoing his earlier concerns regarding deposits in Russian banks, on March 6, 2014, David Reuben emailed Daniloff about his deposit in Razvitie Bank—which is owned by Daniloff's close personal friend—stating, in part, "Eliot, my concern about the bank that you deposited money is that it is practically a large part of the banks equity. . . .  The equity of the bank us nearer 40 million dollars and depositing close to half their equity.  That could be dangerous.  We suggest that if you let Alexander Bushaev place this we have several non risk deals that can provide high interest returns."

89.     Indeed, Razvitie Bank had so little in capital that the $20 million deposit was more than its total capital prior to the deposit.

90.     Later that year, on July 8, 2014, David Reuben continued to instruct Daniloff not to deposit the funds in Razvitie Bank, stating, in part, that he wanted Bushaev to be the signatory

on any UMG expenditure and also that he was "very anxious regarding the money you placed in the Russian bank.  This is the most worrying.  Any bank willing to pay over the odds interest, is the sign that the bank is one that is cash tightness and that can lead to insolvency with the loss of cash."

91.     David Reuben reiterated this in an email to Daniloff on July 29, 2014:  "Dear Elliot . . . I need you to take all the deposits out of Russia this week if not tomorrow. . . we agreed to that so long time, I cannot understand why this has not already been done.  This needs to be done urgently."  In the same email, David Reuben also instructs:  "Please make absolutely sure that we are not spending any money on the big [pig] project."

92.     In August 26, 2014, Gould reported his belief that "there are some fundamental problems with UMG's management.  The problems have led to a stage where we have no cash (1m in RUB [approximately $17,500] in total in the Group), operations are being severely affected and we also run the risk of trouble with the regional government . . . [I]n order to make the changes I see necessary . . . [Elliot] needs to be controlled much more tightly. . . .  [W]e have a major liquidity crisis . . . .  Razvitie . . . is currently a black-box and [we] do not understand whether the USD 20m are gone. . . ."

93.     Notably, as anticipated by David Reuben, Razvitie Bank *failed* on October 10, 2016 and UMG's deposits in that bank *were lost*.  According to a notice issued by the Central Bank of the Russian Federation in connection with the failure, Razvitie had "implemented high-risk lending policy connected with placement of funds into low-quality assets.  Equity capital adequacy was down to critical.  Management and owners of the credit institution did not take any efficient measures to bring its activities back to normal."

21

94.     In addition, on March 18, 2017, the Moscow Prosecutor's Office revealed its discovery of a "fraudulent scheme for embezzlement of a large amount of money from the Razvitie bank.  As reported on the website of the Russian Prosecutor General's Office, the funds had been stolen under the guise of issuing unsecured loans of over 3 billion rubles ($52 million)."

**D.     These Expenditures, and Daniloff's Explanations of Them, Demonstrate he Never had any Intention of Paying Bloomfield Back**

95.     From 2012 through 2014, Daniloff continued to misrepresent where he was spending UMG's money (including the $25 million from Bloomfield and the $30 million from the bond offerings).

96.     In the Summer of 2012, David Reuben met with Daniloff, Orkin and Bendersky in Aventura, Florida.  At that meeting, David Reuben asked Daniloff whether Daniloff was taking, or planned to take, any funds out of UMG for Daniloff's personal use.  Daniloff indicated that he had not taken, and would not take, any money for personal use.

97.     By mid-2013, it became clearer to Bloomfield that Daniloff was engaged in wrongdoing in managing UMG.  Daniloff avoided answering Bloomfield's direct questions regarding the whereabouts of the loan proceeds and the development of the business, repeatedly made excuses that he had run into difficulties and needed time to resolve them, but that Bloomfield should "not worry" about the return of Bloomfield's $25 million.

98.     As a result, on June 27, 2013, David Reuben emailed Daniloff in an attempt to confirm the status of the $25 million:  "Based on the latest net asset value statement [from the Synergy Funds], [the $25 million] was worth $24.37m as of [March 31, 2013], I understand the decrease is due to the payment of management fees to the fund managers.  So far our "loss" is $670k.  I am not aware of any other expense associated with this project.  I understand the

missing is the amount you took as fees.  However the interest alone should have shown a greater

increase.  Is that right?"

99.     Daniloff replied to David Reuben later that day, acknowledging that interest on

the loan is accrued by UMG (the borrower):  "You are absolutely right.  However, interest is

accrued on the United Meat Group level and management fees are accrued on the fund level.

Thas [sic] is why the interest accrued is not seen on the fund level."

100.    Here, Daniloff again confirmed the nature of the loan, and gave an unintelligible

and misleading response on how interest was being paid.

**E.     Daniloff Confirms His Understanding that He Must Re-Pay
        Bloomfield's Loan by Negotiating Myriad Forms of Repayment, Each
        of Which He Fails to Honor**

101.    In 2012 and 2013, as Bloomfield expressed concerns about the $25 million loan,

Daniloff continued to confirm that the $25 million would be returned to Bloomfield by the end of

2013, consistent with their Original Agreement.

102.    On June 2, 2013, Daniloff emailed Orkin and Bendersky recapping "what has and

what has not been done" on the UMG project.  In that email, Daniloff states: "the first task was

to implement the project over ***two years***; to find credit and ***return the initial investment***."

(emphasis added).

103.    On July 13, 2013, David Reuben emailed Daniloff, reiterating the terms of the

agreement:  "When we [the Reuben Brothers] were approached the only reason we agreed to

entering this deal since it was not our core business was you asked that we put a loan that stays in

escrow but on the back of it you can have loans from Russian banks.  For this you offered us 25

percent of the shares and we agreed to that."

104.     On July 15, 2013, Jamie Reuben participated in a phone conversation with

Daniloff that was memorialized in emails exchanged with Daniloff on July 16 and 17, 2013

(Daniloff's responses to Jamie Reuben in bold):

> Dear Elliot,
>
> Further to our call yesterday I would like to confirm the following.
>
> We have agreed that no further cash will be used at all unless we
> have approved it.
> **-agreed**
>
> We have agreed that you will send us a proposal ASAP on
> returning the money by the end of the year so we revert to our
> original understanding.
> **-within the next week should he [sic] ready for providing**

105.     Hence, Daniloff again confirmed the Original Agreement between him and

Bloomfield that the money would be returned to Bloomfield by the end of 2013, and that it

would not be used without Bloomfield's consent, but continued  to misrepresent his true

intentions to never to comply with the same.

**1.     August 2013: Daniloff's Promise of Repayment Negotiated
with Jamie Reuben**

106.     In August 2013, Jamie Reuben asked Daniloff to meet him at the Mark Hotel in

New York.  At that meeting, Daniloff (i) admitted that he had not adhered to the terms of the

deal with Bloomfield; (ii) confirmed the terms of the Original Agreement with David Reuben

and (iii) committed to returning $16.5 million of the $25 million by the end of 2013.

107.     In an email, dated August 2, 2013, Jamie Reuben requested written confirmation

of the same:  "Essentially that the $25m needs to be returned.  In your email you have stated that

by the end of the year we will be returned $16.5m of the $25m."

108.     Daniloff replied on August 11, 2013:  "Jamie, I confirm that the plan to return

$16.5m is correct and as of now there are no deviations to the plan."

109.   On September 19, 2013, a meeting was held between Bloomfield (represented by James J. Viciana), Daniloff and Orkin.  At that meeting Daniloff represented that the $25 million would be returned by the end of the year.  When Viciana asked where Daniloff anticipated obtaining the funds, Daniloff explained that he would receive $16 million in tax refunds from the Russian government and another $2 million would be available from a matured investment (among other sources).

110.   On November 15, 2013, Jamie Reuben reminded Daniloff of the impending deadline to return the monies, as promised:  "Elliot we had agreed the remaining of $16.5m of the $25 to RB [Reuben Brothers] by the years end and then we were due to work out how to get back the remaining $8.5m, Our position on this has not changed."  Daniloff responded to Jamie Reuben the same day:  "As was agreed with David [Reuben]."

111.   However, the end of 2013 came and went without any payment from Daniloff to Bloomfield, in direct contravention of his Original Agreement with Bloomfield, and Daniloff continued to misrepresent his true intention never to perform the terms of the Original Agreement.

**2.**   **March 2014: Daniloff's Promise of Repayment After Capital Injection**

112.   On March 13, 2014, Daniloff met with Bushaev at the offices of Reuben Brothers SA in Geneva, Switzerland.  At that meeting, Daniloff told Bushaev that he had an investor ready to contribute $150 million to UMG and that Daniloff would use that money to repay Bloomfield.

113.   In fact, in an April 2014 meeting, Daniloff advised Reuben that he was travelling to Dubai in mid-October 2014 to consummate a deal with a counterparty, Mr. Rashid Al

Habtoor, who was expected to raise $150–170 million in equity and $150 million in debt for

UMG, which Daniloff would use to repay Bloomfield by October 2014, at the latest.

114.    Later that year, on June 26, 2014, David Reuben emailed Daniloff:

> As you are aware I am exceptionally unhappy as I came into this
> deal because you and Arkadi guaranteed met [sic] that you needed
> 25 m to be able yo[u to] borrow against that, this money will
> remain in escrow.  Safe untouched and paid back . . . and it will be
> closed with a year and I allowed latest two years. . . .
>
> But you took this money and used it, without my knowledge,
> suddenly I am not [sic] part of a fund that I never agreed to then or
> ever . . . and the money you borrowed you pot [sic] into the hands
> of a weak bank.
>
> Eliot I need our money repaid and this is what you must
> concentrate on.  Also I am not certain where money is used and I
> lit [sic] this monitored.

115.    Daniloff replied the next day:  "I appreciate your trust.  Indeed I am concentrating

on raising additional equity for UMG as we discussed before.  ***And we do understanding that

your initial investment must be returned first***. . . .  Mehmet [Saydam], and UMG have discussed

the . . . approval process for payments that will be implemented." (emphasis added).

116.    David Reuben responded on June 27, 2014:

> Thank you.  Eliot you need to accept and address that the money I
> placed was not meant to be a used investment.  It was temp secured
> escrowed amount.  It is for this reason I like it returned because
> you used it without my permission.  I never assumed I would be
> same risk as I am no as I would negotiated a different deal if that is
> I would have invested in the first place.

117.    Daniloff agreed, replying on June 27, 2014:  "We do our best and I trust we will

be able to correct the situation."

118.    Still, Bloomfield did not get its money back and Daniloff continued to

misrepresent his intention not to ever perform the Original Agreement.

3. **July 2014:  Daniloff Promised Repayment Via Negotiation with Saydam**

119.    On July 24, 2014, Saydam and Daniloff reached another agreement regarding the method by which Daniloff would repay the $25 million to Bloomfield, as recounted in a July 25, 2014 email from Saydam to Orkin and Daniloff, which stated, in part:

> Thank you for the call yesterday.  Here is to recap what has been discussed/agreed:
>
> 1) Synergy Accounts: From now on no payment will be made from any of the Synergy accounts without explicit authorization by RB. . . .
>
> 2) **USD 1.8 mio payment to RB:** . . . RB will redeem an equal number of shares which the fund will buy. . . .  But to avoid RB's share to reduce, Elliott will 'sell' shares to RB at nominal value . . . .
>
> \*       \*       \*
>
> 5) USD 20.4m:
>
>    a.  We will establish UMG-Dubai
>
>    b.  UMG-Russia will . . . deposit USD 20,4mio (and provide a pledge) with a friendly western Bank.
>
>    c.  The Bank will use this deposit as cash cover to loan USD 20,4mio to UMG-Dubai
>
>    d.  UMG-Dubai will use the USD 20.4mio to buy from RB some of its shares in Synergy
>
> 6) **UMG-Dubai**: . . . **Until full** repayment of USD 25mio RB will own 90% of UMG-Dubai who will own 100% of UMG-Russia. **After full** repayment, RB will return 55% of UMG-Dubai shares.
>
> 7) **UMG-Dubai Shareholder's agreement**:  Elliot instructed his lawyers to draft a Shareholders agreement[.]

120.    On July 28, 2014, Daniloff replied to Saydam's email stating, in part, "Great, lets speak in details about payments and the bank when you will be in Moscow next week."  He also noted that the shareholders' agreement was in the process of being drafted and that he did not need any assistance in setting up UMG-Dubai.

121.    However, Daniloff failed to follow through on this agreement and continued to conceal his true intention to never return the money to Bloomfield.

### 4.    September 2014:  Daniloff Promises Repayment to David Reuben

122.    On September 11, 2014, Daniloff explained the progress of UMG to David Reuben and again promised repayment of the $25 million by October 9, 2014.

123.    On September 17, 2014, David Reuben emailed Daniloff reminding him of his promise to repay the loan by October 9, 2014, at the latest.

124.    Daniloff responded in agreement the next day, stating, among other things, that he was working on an agreement with the lawyers to pledge 70%–90% of his own shares in UMG "against repayment of 25mm."

125.    Shortly thereafter, on October 6, 2014, Saydam (on behalf of Bloomfield) wrote to Daniloff, requesting Daniloff's feedback on certain objectives, most notably: "[o]btain release of the US 25m deposit . . . ."

126.    One day later, Daniloff replied: "[w]orking on it as of Now."

127.    Nothing resulted from Daniloff's promises and Daniloff continued to conceal his true intentions.

### 5.    October 2014:  Daniloff Promises Repayment by the End of 2014

128.    In October 2014, Saydam, Daniloff and Orkin once again discussed the repayment of the $25 million loan.  A summary of the discussion, circulated to the parties on October 10, 2014, reflect that Daniloff agreed, among other things, that:

> 3)    If UMG has not managed to repay RB until 31.12.2014, RB will enforce the pledge and own 100% of UMG.  RB will than have sole discretion over the recovery procedure.  If the recoveries exceed USD25m, the excess will be first applied to repay the accrued interest to RB (rate to be agreed) and the rest will be distributed in a manner to be agreed.

> 4)    If RB is repaid before 31.12.2014, the pledge over the 50% of the shares will fall away and RB will return 25% of its shares.

129.    Orkin wrote that he "agree[d]" that the minutes reflected the parties' discussions. When Saydam pressed Daniloff for confirmation, Daniloff stated that he "[w]ill reply shortly."

130.    When such payment did not materialize by mid-October, Daniloff and Bloomfield again exchanged emails on October 16, 2014, in which Saydam memorializes the agreement that, among other things, "If RB is repaid before [December 31, 2014], the pledge over the 50% of the shares will fall away and RB will return 25% of its shares."  Daniloff replies "**Agreed as to the part of returning 25% for 25 mm**." (emphasis added).

### 6.    Daniloff Promises Partial Repayment of $15 Million, Followed by Repayment of the Other $10 Million

131.    Further to Daniloff's promises, the parties again negotiated repayment.  During the week of November 3, 2014, Daniloff met with David Reuben in London and advised that he would transfer $15 million (of the $25 million owed) to an escrow account controlled by either David Reuben or Alex Bendersky.

132.    Pursuant to Daniloff's agreement to transfer $15 million out of the $25 million owed, Saydam emailed Daniloff on November 12, 2014 asking that the $15 million be transferred by that Friday, November 14, 2014.  Saydam notes that "[f]or the avoidance of doubt our preference is to be repaid the $25m in full now as was the original understanding.  However we note your commitment to David/Arcady to repay first $15m this week into an escrow account followed by $10m shortly after . . . ."  Daniloff replied to Saydam the same day stating that he was "working with the banks to get the funds."

133.    The $15 million transfer did not happen and Daniloff continued to conceal that he had never had any intention of returning the $25 million.

**7.    Daniloff Executes the November 26, 2014 Agreement to Repay Bloomfield**

134.    On November 21, 2014, Saydam sent Daniloff an email with the subject line "UMG: Repayment" in which he noted that Daniloff had confirmed the "good news" that the $25 million would be repaid by December 2, 2014, and suggested that he and Daniloff begin discussing the "repayment method" over the weekend to "start implementing as of Monday." Daniloff replied the same day:  "I am happy to discuss over the weekend."

135.    On November 25 and 26, 2014, a meeting was held at UMG's office in Moscow. Daniloff, Orkin, Saydam, Bendersky and Gould attended the meeting.

136.    On November 26, 2014, Saydam sent a summary of the meetings to, among others, David Reuben, Simon Reuben, Jamie Reuben, Bushaev and Orkin.  The minutes reflect that the parties agreed that, among other things:

> a.    In the first half of December 2014, UMG would take $30 million out of the next bond drawdown from which $25 million would be used to repay Bloomfield's loan.
> b.    To execute this repayment, there would be a back-to-back loan structure whereby UMG would provide a loan to an SPV which would then buy $25 million worth of Bloomfield's shares in UMG.
> c.    Bloomfield would retain 25% of UMG after repayment of the $25 million.

137.    As a result of that meeting, an agreement titled "UMG [11/26/14]" was signed by all parties, including Daniloff, that stated, in part:  "30 million Bond 26 net 25 goes to David.  ETA [12/15/14]" and "Do the b2b [back to back] loan to repay RB." (emphasis added) (the "November 26 Agreement").

138.    In an email exchange over the course of November 25 and 26, 2014, Daniloff confirmed that the date of transfer would be "the first half of December."

139.    Pursuant to the November 26 Agreement, UMG opened a Dutch bank account at Demir-Halk Bank in the Netherlands (the "DHB Account") within which the $25 million would

be deposited.  Demir-Halk Bank was employed for this purpose due to the financial turmoil in Russia at this time.

140.    Daniloff agreed to transfer the money into the DHB Account by December 15, 2014, and to allow Bloomfield to have signature power over the account.  Bloomfield designated Patrick O'Driscoll as its signatory over the account.

**8.     Daniloff Breaches the November 26, 2014 Agreement to Repay Bloomfield**

141.    On December 3, 2014, Daniloff told David Reuben that the "30mm Note is settled today" and that he would like to have a meeting.

142.    Two weeks later, on December 11, 2014, David Reuben emailed Daniloff reminding him of the impending deadline to transfer the money into the DHB Account and noting "[y]ou sometime give the impression I am investor in the fund.  I am not.  I was to put this in escrow and get paid back within two years.  You broke the cardinal rule entrusted to you by taking this money."

143.    Daniloff replied the same day, once again confirming his understanding of the deal and obligation to return David Reuben's money:  "I understand your position very well and support it . . . . [Orkin] brought you in as a partner in the deal who provides necessary liquidity for the project and in return after funds paid back you split 50% stake in the company with him."

144.    On December 15, 2014, David Reuben wrote Orkin and Daniloff that he is "awaiting the transfer of the 25 million which should be any day and I have Eliot confirmation."

145.    Daniloff failed to transfer the $25 million to the DHB Account by December 15, 2014.

9.      **Late 2014–Early 2015: Daniloff's Additional Promises to Re-Pay Bloomfield**

146.    On December 23, 2014, Daniloff emailed Orkin, laying out an alternative plan as to how he planned to repay the $25 million:  "15 [million] should be placed in the account with DHB Bank as proposed by Mehmet [Saydam]. . . . Early next year, we will start working with Razvitie bank on returning our bills of exchange, in order to invest an additional $10MM in DHB Bank."

147.    Orkin continued this email exchange the next day, telling Daniloff:  "I don't get it. . . . We were planning and talking about paying 25 million to David, rather than 15 million."  And, in an email later that day, Orkin added:  "I don't see why we need to change what we had agreed and put more strain on relations with our partners, which are sufficiently strained as it is."

148.    Daniloff again agreed, replying on December 25, 2014:  "What you are saying is true, however all that takes time.  Today, we can comfortably place $15 [million] the rest can be placed as we agree it with Razvitie."

149.    Despite this statement, no funds were transferred on December 25, 2014.

150.    Hence, on December 25, 2014, David Reuben emailed Orkin expressing that he was "very disappointed" that the $25 million had not yet been transferred.  David Reuben noted that the money was taken "without permission" and that "[s]uch cases are criminal[.]"

151.    Orkin forwarded Reuben's email to Daniloff stating that "[t]his is not going to end well…"

152.    Daniloff replied to Orkin, assuring him that the $25 million would be transferred:  "I have the impression that no one wants to know how the processes are going.  Everything takes time; even opening a bank account takes time."  In a separate email from Daniloff to Saydam on

that same day Daniloff stated that the money could be transferred to the DHB Account "on Monday (December 29, 2014)."

153.     On December 29, 2014, Daniloff suggested repayment via a "redemption."  In response, Saydam told Daniloff that Bloomfield did not want to use "this 'redemption' option and [instead] focus all the repayment [via a different] mechanism."  Daniloff replied in an email later that day: "Ok."

154.     Daniloff did not transfer any funds on Monday, December 29, 2014.

155.     That same day, Daniloff advised David Reuben that "[t]he funds will be transferred first day after Russian holiday which is Jan 9th."  Later that night, Daniloff implored David Reuben:  "Please with all respect to you don [sic] not bring up this issue anymore since I clarify to you that funds will be in 10 days."

156.     On January 7, 2015, David Reuben sent an e-mail to Saydam and Daniloff recounting how Daniloff told him that he could not send wire instructions because the bank was closed, but that "he is going to transfer the money on 9 th [sic] but wants us to Pledge our shares 45 percent before he releases the money to us as agree with you."

157.     Daniloff failed to transfer the money by January 9, 2015.

158.     On January 20, 2015, Daniloff offered to give Bloomfield signatory control over UMG's ING account as he continued to try and find a "workable solution" to their issues.

159.     On January 22, 2015, David Reuben asked Daniloff to "kindly transfer funds to ing [sic] Holland or UK.  Where it is easier to operate these accounts."  Daniloff responded, "Yes I agree."

160.    After David Reuben pressed Daniloff, on January 23, 2015, "to transfer the

money to European bank without question," Daniloff replied, on January 25, 2015, that he is "in

Moscow now and will proceed promptly with the transfer."

161.    On January 30, 2015, David Reuben once again asked Daniloff whether he

transferred the money to DHB.  Daniloff responded on February 1, 2015 that "[t]his week the

transfer of 15mm will be arranged."  On February 5, 2015, Daniloff told David Reuben that

"Funds will be transferred tomorrow to DHB Bank."

**F.    Daniloff Finally Deposits Only $15 Million of the $25 Million Loan
        into the DHB Account, But Refuses to Release the $15 Million to
        Bloomfield**

162.    Ultimately, on February 6, 2015, Daniloff transferred only $15 million into the

DHB Account, claiming that he had agreed with the owner of Razvitie Bank, who was Daniloff's

friend, to leave the remainder of the money in Razvitie Bank.

163.    Bloomfield vehemently objected to this, as Razvitie Bank had questionable

stability, but Daniloff kept the money in Razvitie Bank anyway.  Of Russian banks, Razvitie

Bank was ranked 274th in terms of assets.

164.    On March 4, 2015, David Reuben emailed Daniloff asking that the $15 million be

released, and that he will "push after" the return of the full $25 million, acknowledging that

"[e]nough time has gone by."

165.    Daniloff replied on March 8, 2015, stating:  "Regarding the rest of the funds . . .

[t]he only way to [return the funds] is to sell a 50% stake in UMG for 25-30mm.  That way we

solve several issues: 1) Initial Investment will be returned . . . ."

166.    On April 3, 2015, David Reuben emailed Daniloff demanding that Daniloff

"release the balance of my money."  Daniloff replied on April 6, 2015, stating:  "I have my mind

set to find solutions to release remaining balance." More time passed without Daniloff presenting a solution.

167. Discussions continued and in e-mails to Daniloff and Orkin, dated April 22, 2015 and May 15, 2015, Saydam outlined the parties then-current structure for returning the money:

> 1) USD2m must have been paid today and we should be able to see it on Monday.
>
> 2) We continue with the USD15m (expect to sign/draw next week).
>
> 3) If/When Ilya [Daniloff] brings 50m in to the fund, USD23m will be used to repay David subsequent (or simultaneously but not before) the SPV will repay USD15m which will see UMG's pledge account relased [sic].

168. But, behind the scenes, Daniloff had no intention of returning the $25 million and instead planned to use the funds for his own purposes. To that end, on May 13, 2015, Daniloff caused UMG to adopt a Shareholders' Resolution cancelling Bloomfield's signatory authority over the DHB Account.

169. On June 10, 2015, Zalko and Daniloff, on behalf of UMG, sought O'Driscoll's consent to release the money in the DHB Account to UMG to make an interest payment due to the bondholders on certain of the note issuances. Bloomfield refused to consent absent further information as to why UMG needed the money when it had sufficient funds on deposit with other banks which it could use to make the interest payment on time.

170. UMG responded by forwarding the May 13 Shareholder Resolution to DHB on June 15, 2015 and requesting that DHB terminate the two-signature policy. DHB rejected UMG's request because counsel for Bloomfield had notified DHB Bank that it objected to cancellation of the two-signature system.

171. DHB Bank continued to reject UMG's requests to unilaterally withdraw money from the account in the absence of Bloomfield's required signature. Instead, DHB requested that

the parties establish the validity (or lack thereof) of the May 13 Shareholder Resolution.  But Bloomfield had had enough, and sought legal recourse via the Attachment Proceeding, described in detail below.

**G.      The Attachment Proceeding**

        **1.      <u>Bloomfield Commences the Attachment Proceeding</u>**

172.     On June 16, 2015, Bloomfield requested that the Rotterdam District Court (the "<u>Dutch Court</u>") levy prejudgment attachment by garnishment of the DHB Account (the "<u>Attachment Proceeding</u>").

173.     On June 17, 2015 Bloomfield obtained an order from the Dutch Court attaching the DHB Account in the amount of $15 million.

174.     UMG subsequently requested that the Dutch Court, in summary proceedings, lift the prejudgment attachment imposed against the DHB Account in full so that it could make an upcoming bond payment.  On July 15, 2015, the Dutch Court released only $3.3 million of the attached funds based upon UMG's request that it be permitted to make an upcoming bond interest payment.  Notably, however, the $3.3 million was released to a Russian bank account, not to the Deutsche Bank account from which bondholders are paid.  In addition, the interest payment due was $2.8 million, not $3.3 million, leaving $500,000 unaccounted for.

175.     In its ruling on the request to lift the attachment, the Dutch Court identified evidence presented that provided support for Bloomfield's position that it had loaned $25 million to UMG:

> The statement, or witness statement, and the e-mails submitted by Bloomfield lend support to the view adopted by Bloomfield, that from the very start it had been the express intention of the parties—in the persons of Reuben and Daniloff—that the amount of USD 25,000,000 had been made available as a loan/deposit. More in particular the extensive and detailed witness statements submitted by Bloomfield point in that direction.  The report of the meeting of 26 November 2014 and the specific opening of a bank

account in the Netherlands further to the agreements that had been made, into which account subsequently USD 15,000,000 was deposited, lend support to Bloomfield's view that UMG had committed itself to repaying USD 25,000,000 to Bloomfield.

**2.**   **Daniloff Suddenly Claims that He is Not Required to Return the $25 Million to Bloomfield**

176.    After Bloomfield levied its attachment, Daniloff suddenly posited for the first time that the $25 million was an equity investment in the Synergy Hybrid Fund and did not need to be repaid to Bloomfield.

177.    On June 22, 2015, Daniloff told David Reuben:  "As the terms of the Subscription Agreement make clear, you did not 'loan' either me or UMG $25 million; you invested $25 million in the Fund and your rights to redeem or otherwise recover from the Fund are set forth in the Subscription Agreement and related documents of the Fund."

178.    This sudden and drastic change in position was merely a reaction to the litigation in the Netherlands.  It is wholly inconsistent not only with Daniloff's original representations that induced Bloomfield to loan Daniloff the $25 million, but also with the November 2014 Agreement and Daniloff's repeated representations and promises to return the $25 million to Bloomfield.

179.    Notwithstanding Daniloff's new position, on July 3, 2015, Daniloff told Orkin that he will either earn the money back or sell some shares, but he eventually will pay Bloomfield back.

180.    On August 11, 2015, Bloomfield commenced formal proceedings in the Netherlands against UMG seeking repayment of the $25 million (the "Dutch Plenary Action"). Such action remains pending.

3.      **UMG and Bloomfield Execute an Escrow Agreement**

181.    UMG allegedly needed to make another interest payment to his bondholders and allegedly was at risk for bankruptcy.  Bloomfield was willing to lift the attachments only if UMG agreed to immediate payment of an additional $3 million.

182.    On August 26, 2016, Bloomfield and UMG entered into an Escrow Agreement (the "Escrow Agreement") whereby UMG deposited $4.5 million into an account with ING Bank.  The Escrow Agreement stated that the $4.5 million would be released to UMG upon certain conditions, including specified evidence that (i) $3 million was paid from UMG to Bloomfield, (ii) a new SPV ("NewCo") was formed to hold 100% of UMG shares and (iii) Bloomfield holds 50% of the shares in NewCo.  The Escrow Agreement also stated that if evidence of the $3 million payment was not delivered within forty-two (42) days of the effective date of the Escrow Agreement (September 9, 2016) the $4.5 million would be released to Bloomfield.

183.    The $3 million payment was not made within the 42-day deadline (*i.e.*, by October 21, 2016).  As a courtesy, Bloomfield consented to an additional 41-day extension of time (until December 1, 2016) for UMG to make the $3 million payment.

184.    The $3 million was, again, not paid by December 1, 2016.  As a result, the $4.5 million was released to Bloomfield on December 2, 2016.

185.    Daniloff's fraudulent misrepresentations in this regard extended beyond Bloomfield, to UMG's investors.  Shockingly, in a letter dated March 1, 2017 from Daniloff, in his capacity as Managing Member of the Investment Manager/Director of the Synergy Funds, to the investors in the Synergy Funds, Daniloff claimed that the $4.5 million was "unilaterally withdr[awn]" by Bloomfield.  Daniloff reported that, as a result, the Synergy Funds would treat such an action as a compulsory redemption of a corresponding number of Bloomfield's shares in

the Synergy Funds.  That was wholly untrue.  Daniloff was, through these actions, further

concealing his fraudulent activity.

**H.     Other Subsequent Proceedings**

       **1.     The Dutch Plenary Action**

186.     On July 22, 2015, Bloomfield filed a petition for assistance in aid of a foreign

proceeding pursuant to 28 U.S.C. §1782 seeking discovery in the United States in furtherance of

the Dutch Plenary Action.  The relief was granted on July 23, 2015 and the matter remains open

in the United States District Court for the Southern District of New York ("S.D.N.Y.") before the

Honorable Victor Marerro (the "§ 1782 Action").  There has been both document and testimonial

discovery in the § 1782 Action.

       **2.     The ED Capital Action**

187.     Separately, on November 18, 2015, the ED Capital Entities brought an action in

the S.D.N.Y. captioned *ED Capital LLC, et al.* v. *Bloomfield Inv. Res. Corp., et al.*, No. 15 Civ.

9056 (Marrero, J.) (the "ED Capital Action") seeking, among other forms of relief, a declaratory

judgment that Bloomfield's $25 million transfer constituted an investment, not a loan.  The ED

Capital Entities also sought a preliminary injunction preventing Bloomfield from prosecuting the

Netherlands Action and requiring Bloomfield to release the funds attached in the Netherlands to

permit UMG to make its upcoming bond payment.

188.     On January 5, 2016, Judge Marrero denied Plaintiffs' application for a

preliminary injunction and dismissed Plaintiffs' Complaint under Rule 12(b)(1) of the Federal

Rules of Civil Procedure for lack of standing.  The Court did not reach Defendants' arguments

for dismissal pursuant to Rule 12(b)(6).

189.     On February 3, 2016, Plaintiffs appealed that ruling, which was affirmed, in part,

by the United States Court of Appeals for the Second Circuit on August 26, 2016.

190.    On December 1, 2016, Bloomfield moved to dismiss the remaining claims under

Rule 12(b)(6).  On January 17, 2017, the ED Capital Entities filed a First Amended Complaint.

## CLAIMS FOR RELIEF

### AS AND FOR A FIRST CLAIM
### UPON WHICH RELIEF MAY BE GRANTED
#### (Fraud)

191.    Paragraphs 1 through 190 are repeated and incorporated by reference as though

more fully stated herein.

192.    Daniloff knowingly made numerous misrepresentations of material fact to

Bloomfield, by and through individuals acting on Bloomfield's behalf, including David Reuben.

193.    Daniloff also knowingly omitted and/or failed to disclose numerous material facts

to Bloomfield, by and through individuals acting on Bloomfield's behalf, including David

Reuben.

194.    Daniloff knew or should have known of the falsity and/or incompleteness of his

representations, and/or was reckless with regard to their truth, and the injury that might ensue if

he did not disclose the truth and/or the omitted facts.

195.    Daniloff had a motive to make misrepresentations and/or omit materials facts.

Daniloff admitted his scienter in sworn testimony.  Daniloff's scienter also can be inferred from,

among other things, his reckless disregard of and blindness to the truth.

196.    Bloomfield, by and through individuals acting on its behalf, including David

Reuben, relied upon Daniloff's misrepresentations described above.

197.    Had Daniloff not engaged in the misrepresentations and omissions of facts

described above, Bloomfield, by and through the individuals acting on its behalf, including

David Reuben, would have acted differently.

198.    As a result of Daniloff's wrongdoing described above, Bloomfield has suffered

damages for which it should be compensated.

199.    Daniloff should be held liable for punitive damages, because he engaged in gross

negligence and reckless conduct, including by demonstrating a heedless disregard for the trust

placed in him by Bloomfield.  Punitive damages are warranted to deter others from engaging in

similar misconduct.

## AS AND FOR A SECOND CLAIM
## <u>UPON WHICH RELIEF MAY BE GRANTED</u>
### (Breach of Contract)

200.    Paragraphs 1 through 199 are repeated and incorporated by reference as though

more fully stated herein.

201.    The Original Agreement, and all subsequent agreements between Bloomfield and

Daniloff, are a valid and binding contracts between Daniloff and Bloomfield, by and though

individuals acting on its behalf, including David Reuben.

202.    Daniloff breached the Original Agreement, and all subsequent agreements,  by

failing to perform them according to their terms.

203.    Bloomfield fully performed its obligations under the Original Agreement and all

subsequent agreements.

204.    As a direct and proximate result of Daniloff's breaches, Bloomfield has been

damaged in an amount to be proved at the trial of this action.

## AS AND FOR A THIRD CLAIM
## <u>UPON WHICH RELIEF MAY BE GRANTED</u>
### (Breach of Contract)

205.    Paragraphs 1 through 204 are repeated and incorporated by reference as though

more fully stated herein.

206.     The November 26 Agreement is a valid and binding contract between Daniloff and Bloomfield, by and though individuals acting on its behalf, including David Reuben.

207.     Daniloff breached the November 26 Agreement by failing to perform according to the terms of that Agreement.

208.     Bloomfield fully performed its obligations under the November 26 Agreement, including by refraining from taking legal action against Daniloff to recover Bloomfield's $25 million loan.

209.     As a direct and proximate result of Daniloff's breach of the November 26 Agreement, Bloomfield has been damaged in an amount to be proved at the trial of this action.

**AS AND FOR A FOURTH CLAIM**
**UPON WHICH RELIEF MAY BE GRANTED**
**(Promissory Estoppel)**

210.     Paragraphs 1 through 209 are repeated and incorporated by reference as though more fully stated herein.

211.     The various representations and/or promises made by Daniloff described above, combined with his course of conduct, were made with the reasonable expectation of inducing action and/or forbearance on the part of Bloomfield.

212.     In response to Daniloff's course of conduct and promises and/or representations by Daniloff, Bloomfield, by and through individuals acting on its behalf, including David Reuben, in reasonable and foreseeable reliance, took affirmative actions that were detrimental to its economic interests and/or refrained from taking action in reliance on those promises and/or representations.

213.     Bloomfield has suffered and will continue to suffer an injustice if Daniloff's representations and inducements are not enforced and Daniloff is not estopped from asserting

42

any denial of said liability as a consequence of his representations and the inducements to Bloomfield as described above.

## AS AND FOR A FIFTH CLAIM
## UPON WHICH RELIEF MAY BE GRANTED
### (Unjust Enrichment)

214.    Paragraphs 1 through 213 are repeated and incorporated by reference as though more fully stated herein.

215.    As a consequence of the conduct previously described, substantial monetary benefits were conferred on Daniloff by Bloomfield.

216.    The receipt of these benefits by Daniloff was facilitated by Daniloff's misrepresentations, omissions, and/or other conduct described above.

217.    Daniloff has been unjustly enriched in amounts in the aggregate total in the millions of dollars.

218.    Notwithstanding Bloomfield's, by and through individuals acting on its behalf, including David Reuben, requests and demands that Daniloff remedy this unjust and inequitable behavior, Daniloff has failed and refused to compensate Bloomfield for its pecuniary losses and has retained the unjust and inequitable economic benefits of its conduct.

219.    Permitting Daniloff to retain these benefits and to avoid compensating Bloomfield for its pecuniary losses would effectuate an injustice that equity should endeavor to remedy.

220.    Accordingly, Bloomfield seeks to recover damages in the value of the inequitable benefits conferred upon Daniloff, in an amount to be proved at the trial of this action, and Daniloff should be required to refund those monies to Bloomfield.

## JURY TRIAL DEMAND

221.    Plaintiffs demand a trial by jury on each issue triable thereby.

43

**WHEREFORE**, Plaintiffs demand judgment:

a.  Awarding compensatory damages in favor of Plaintiff against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be determined at trial, including interest thereon;

b.  Awarding punitive damages in favor of Plaintiff against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial, including interest thereon;

c.  Awarding Plaintiff its reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d.  Awarding such other and further relief as this Court may deem just and proper.

Dated:  June 7, 2017
    New York, New York

                              **REED SMITH LLP**

                                   /s/ C. Neil Gray
                            Steven Cooper
                            C. Neil Gray
                            Kristen Hindley
                            Ian Turetsky
                            599 Lexington Avenue
                            New York, New York 10022
                            Tel:  212-521-5400
                            Fax:  212-521-5450
                            Email:  scooper@reedsmith.com
                            Email:  cgray@reedsmith.com
                            Email:  khindley@reedsmith.com
                            Email:  ituretsky@reedsmith.com

                            *Attorneys for Plaintiff*
                              *Bloomfield Investment Resources Corp.*