USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _5/23/2023_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BLOOMFIELD INVESTMENT RESOURCES CORP.,

                              Plaintiff,

            - against -

ELLIOT DANILOFF,

                              Defendant.

17 Civ. 4181 (VM)

<u>DECISION AND ORDER</u>

**VICTOR MARRERO, United States District Judge.**

Plaintiff Bloomfield Investment Resources Corporation ("Bloomfield") brought the instant action against defendant Elliot Daniloff ("Daniloff") for fraud, breach of contract, promissory estoppel, and unjust enrichment. (See "First Amended Complaint," Dkt. No. 51.) Bloomfield asserts that it loaned $25 million to a company owned by two investment funds managed by ED Capital, LLC and ED Capital Management, LLC (collectively, "ED Capital"), entities entirely owned and controlled by Daniloff, and that it loaned this money in reliance on Daniloff's fraudulent promises and has not been repaid. Daniloff counters that Bloomfield's transfer of $25 million to Daniloff's company constituted an investment into the investment funds with no guarantee of repayment.

The Court conducted a four-day bench trial from October 24, 2022 to October 27, 2022. The Court now sets forth its findings of fact and conclusions of law pursuant to Rule 52(a)

of the Federal Rules of Civil Procedure. The Court concludes that Bloomfield has produced evidence sufficient to support its claims for fraudulent inducement and breach of an oral loan agreement that was subsequently modified. Accordingly, Daniloff is liable to Bloomfield, which is entitled to compensatory and punitive damages on those claims.

## I.    FINDINGS OF FACT[1]

Daniloff is a New York resident. Through ED Capital, Daniloff serves as the investment advisor and investment manager of two investment funds: Synergy Hybrid Fund Ltd. (the "Synergy Hybrid Fund") and Synergy Hybrid Feeder Fund Ltd. (the "Synergy Hybrid Feeder Fund" and with Synergy Hybrid Fund, the "Synergy Funds"). The Synergy Funds are Cayman Island investment funds that invest in Russian public and privately held equity and debt securities. The Synergy Funds hold 100 percent of the shares of United Meat Group ("UMG"), a Russian agricultural corporation involved in poultry production. Daniloff created UMG in 2009 and became its controlling owner. UMG is the Synergy Funds' primary asset.

---

[1] While the Court has reviewed and considered all of the live testimony, affidavits, and accompanying exhibits admitted in evidence in connection with the trial in this matter, the Court addresses only those portions of the evidence relevant to the Court's legal conclusions.

Bloomfield is an entity created by and under the control of David and Simon Reuben (the "Reuben Brothers"), who are very wealthy investors based in London.

A.    NEGOTIATIONS AND THE ORIGINAL AGREEMENT

The dispute in this case began when David Reuben ("Reuben") was first introduced to Daniloff through Arkadiy Orkin ("Orkin"). Orkin has had a business relationship with Reuben and the Reuben Brothers since the 1990s. Orkin's son-in-law, Alex Bendersky ("Bendersky"), was a close friend of Daniloff's since childhood, and Orkin viewed Daniloff as a member of his own family. In 2010, Orkin learned about Daniloff's plans to venture into the Russian agricultural sector through UMG. To fund his project and obtain loans from Russian banks, Daniloff needed to show additional equity capital on the books of UMG. Orkin sought to help Daniloff in this regard.

In November 2010, Orkin contacted Reuben to brief him about Daniloff's project and to gauge whether Reuben would be interested in providing financial support for the project. Reuben informed Orkin via email that he was "presently not making investments in funds." (Pl. Ex. 1; Trial Transcript

("Tr.") at 11:10.)[2] Reuben was reluctant to get involved in Daniloff's venture, but Orkin assured Reuben that "this business has no connection with the fund. It is owned by [a] private company OJSC United Meat company 100 percent controlled by Elliot [Daniloff]." (Pl. Ex. 1; Tr. at 11:18-21.)

Upon Orkin's recommendation and persuasion, Reuben met with Daniloff in 2011 in London, and several times thereafter, to learn more about Daniloff's project. Daniloff needed roughly $20 to $30 million in funding to purchase equipment and obtain additional loans from banks. Reuben explained to Daniloff his concerns about the project because Reuben did not want to make any investments and no longer invested in Russia. Given Reuben's hesitation, Daniloff proposed that Reuben could instead provide him with a short-term loan of $25 million, which would be held in escrow in a bank. Daniloff could show the $25 million on the books, thereby allowing Daniloff to raise money from Russian banks. The loan would be paid back in several years. As collateral toward the loan,

---

[2] Prior to trial, the parties stipulated that they do not object to the admissibility of the exhibits introduced as part of the record. Therefore, all exhibits were admitted into evidence without objection. (See Joint Pretrial Order at 5; Tr. at 9:12-16.)

Reuben would obtain 50 percent of UMG's shares, which would be reduced to 25 percent after he was paid back in full.

In July 2011, Reuben emailed one of his employees, Alexander Bushaev ("Bushaev"), outlining his understanding of the proposition. Bushaev was the Chief Financial Officer ("CFO") of the Reuben Brothers' offices in Geneva, Switzerland and looked after their loan portfolio. In the email, Reuben explained that the $25 million to Daniloff would be "show[n] as equity altho[ugh] given as [a] loan and any d[i]sbursements to be monitored by [Reuben]." (Pl. Ex. 6.) Reuben and Bushaev also discussed the arrangement by phone. Reuben indicated to Bushaev that Reuben's entire discussion with Daniloff about the transaction reflected that the $25 million transfer would be in the form of a loan that would only be shown as equity because Daniloff would "not be able to borrow against the loan; he can only borrow against what will be shown as an equity." (Tr. at 22:22-24.)

Daniloff did not want to put this agreement (the "Original Agreement") in writing. If Reuben's name appeared on the loan, Reuben's high-profile status would make him a target of guarantees and banks in Russia, posing an obstacle to Daniloff borrowing money. Daniloff proposed that, instead, the loan appear as an investment which would hide Reuben's

name from the transaction and allow Daniloff to obtain
additional loans from banks. However, the $25 million would
remain a loan and be held in escrow.

Reuben was comfortable making this arrangement orally,
instead of in writing. According to Reuben, a contract was
never signed in the majority of the business deals he had
entered into in Russia. Instead, business agreements were
entered into and honored on the strength of trust and
confidence grounded on the bonds of family and friendship.
Despite relying primarily on oral contracts, Reuben had never
failed to recoup his money. Thus, Reuben felt that he had no
reason to believe that Daniloff would fail to repay him,
including because Orkin vouched for Daniloff as part of the
family and assured Reuben that he would work on this venture
together with Daniloff.

After rounds of discussions, Daniloff and Reuben agreed
to the terms of the Original Agreement roughly around
September 2011. According to Reuben, the two "shook hands . . .
[and] did the deal." (Id. at 17:19-20.) Accordingly, the
Original Agreement provided that Reuben would loan $25
million to Daniloff on the condition that (1) the funds would
be fully repaid in roughly two years; (2) the funds would
remain in a segregated bank account, any disbursement of which

would require Reuben's authorization; (3) Reuben would receive a 50 percent stake in UMG as security for the loan; and (4) Reuben's shares in UMG would be reduced to 25 percent upon full repayment.

B.   THE SYNERGY HYBRID FUND

Roughly around September 2011, Daniloff informed Reuben that he would need documentation signed so that the loan could appear as an investment in his investment fund, the Synergy Hybrid Fund. To accommodate Daniloff, Reuben designated Patrick O'Driscoll ("O'Driscoll"), the CFO of one of the Reuben Brothers' offices, as point person to help Daniloff effectuate the transfer of the $25 million into the Synergy Hybrid Fund, which would serve as a conduit for the loan proceeds. At no point, to Reuben's understanding, was this channeling of the loan proceeds through the Synergy Hybrid Fund actually meant to be a true investment into the fund. At that time, Daniloff likewise made no representations to Reuben that he believed that the money he received was a true investment and not a loan.[3]

---

[3] The Court recognizes that in various emails, the parties, at times, refer to the $25 million amount as an "investment." However, in other communications and discussions also evidenced in the record, the parties refer to the transaction as underpinning a loan. Despite the characterization of the funds as an "investment" in those emails, the terminology does not reflect whether the parties believed the funds were a true "investment" into the Synergy Hybrid Fund that would require any repayment to be made via the redemption process based on a valuation of

Reuben's representatives exchanged multiple emails with Daniloff confirming that the Synergy Hybrid Fund acted only as a conduit for the loan proceeds to be shown as an investment and that the funds would continue to be held in escrow with Bloomfield having signatory control, consistent with the Original Agreement. For example, on September 6, 2011, O'Driscoll emailed Daniloff for confirmation that the fund was for "visibility purposes" and "in reality, the investment is not sitting in the fund." (Def. Ex. E; Pl. Ex. 12.) Though at trial, Daniloff testified that he did not remember the email sent by O'Driscoll (see Tr. at 183:21-22), at the time that O'Driscoll sent the email, Daniloff did not dispute O'Driscoll's characterization of the Synergy Hybrid Fund's limited purpose or how the proceeds would be used. On September 14, 2011, Ben Webb ("Webb"), an employee of O'Driscoll's who assisted with the administration of the loan proceeds, emailed Gennady Zalko ("Zalko"), the Chief Executive Officer of UMG, that: "In order for us to invest, we will require that we become signatories on the bank accounts so that expenditure is controlled with our

shares. Thus, the imprecise vocabulary used by the parties out of convenience does not preclude the finding that the transfer of proceeds constituted a loan, especially viewed in light of the parties' overall conduct, testimony, and the totality of the evidence in the record.

authorisation." (Pl. Ex. 15 at 6896; Tr. at 192:2-6.) Despite Daniloff insisting at trial that Zalko did not represent Daniloff, Daniloff had explicitly instructed Webb to contact Zalko directly regarding opening an account at ING Bank where the loan proceeds would be held in escrow.

After this email correspondence, Zalko set up an account with ING Bank where the loan proceeds were to be deposited and remain untouched absent Reuben's express authorization, and over which Webb would have signatory authority on behalf of Reuben. In October 2011, Bushaev set up Bloomfield, the special purpose vehicle ("SPV") through which Reuben would transfer $25 million to the Synergy Hybrid Fund. To effectuate the transfer, Daniloff needed Reuben or his representative to sign a subscription agreement (the "Subscription Agreement") for the Synergy Hybrid Fund. On November 3, 2011, per Reuben's direction, Bushaev executed the Subscription Agreement. Webb emailed Daniloff and a representative of Apex, the administrator of the Synergy Hybrid Fund, the signed Subscription Agreement and asked Daniloff directly to confirm that he received the document and for "next steps, including transfer to the ING account." (Id. at 199:7-8; Def. Ex. J-1.)

C.   <u>THE TRANSFER OF THE $25 MILLION</u>

Shortly after the Subscription Agreement was executed on November 3, 2011, Bloomfield wired the $25 million to Daniloff, and the funds became cleared for use on December 22, 2011. (<u>See</u> Pl. Ex. 23.) Despite Bloomfield initiating the transfer of the funds, Daniloff did not respond to Webb's November 3, 2011 email asking for next steps. Webb emailed Daniloff once more on January 24, 2012, again seeking confirmation that "the funds will be transferred to the ING Bank account opened for this business." (Def. Ex. P at 2520.) Webb further noted that "[n]o amount should be committed unless David agrees [to] the spend in advance." (<u>Id.</u>) Daniloff replied to the email, stating: "I confirm the funds will be transferred to the ING Bank account." (<u>Id.</u>) At trial, Daniloff indicated he did not remember this email, but that he was "sure the money was transferred" to that account. (Tr. at 200:7, 200:13-17.) In fact, it was not.

In April 2012, Webb emailed Daniloff for an update on the status of the loan that was supposed to be held in the ING Bank account as he had not received any notice from the bank that the proceeds had been transferred. Daniloff emailed Webb that "[t]he funds sit on deposit in SberBank." (Tr. 202:9-10; Def. Ex. P.) SberBank is a Russian bank, and

Bloomfield did not have signatory control over any bank account at SberBank.

While Daniloff claimed in April 2012 that the Bloomfield funds were deposited in a SberBank account, Bloomfield established at trial that in fact, immediately after the funds became available to Daniloff on December 22, 2011, he dispensed with a large portion of the funds without Reuben's authorization or knowledge. After first receiving unblocked access to the $25 million in December 2011, Daniloff directed an ED Capital employee to (1) wire $10 million to a UMG bank account at SberBank; (2) pay Apex's third quarter fees for 2011; (3) reimburse ED Capital's setup fees; (4) pay fourth quarter management fees to ED Capital; and (5) transfer the remaining funds to an account with HSBC Bank, another account over which Bloomfield was not a signatory. (See Pl. Ex. 23.)

Further, on January 1, 2012, Daniloff reorganized the Synergy Hybrid Fund, transferring Bloomfield's funds from the Synergy Hybrid Fund into a new Synergy Hybrid Feeder Fund. Despite this change, Daniloff did not seek Bloomfield's approval for the reorganization until March 5, 2012, three months after it had already occurred. While Bloomfield had signed the Subscription Agreement for the Synergy Hybrid Fund,

Bloomfield never executed a subscription agreement for the Synergy Hybrid Feeder Fund.

Though Daniloff contends that the Subscription Agreement controlled the parties' relationship, the parties acted consistently with the Original Agreement and not the Subscription Agreement. For example, in January 2012, Daniloff emailed a "Dear Colleagues" letter to Orkin, Reuben, and other representatives of the Reuben Brothers, outlining proposed uses of the funding. (See Pl. Ex. 42 at 3519.) Upon receipt of the email, Reuben promptly responded to Daniloff that he did "not want the funds used th[at] way" and directed him not to commit to using the funds for anything. (Id.) Reuben further explained that the money could be used only if Reuben received a form of security, such as if there was equity or other loans provided by banks, and that the money needed to be "quickly [paid] back as agreed." (Id.; see also Tr. at 36:4-15.) Daniloff responded to Reuben's email, "ok will do." (Pl. Ex. 42 at 3518.)

In a July 2012 email to Orkin, Reuben recounted a meeting with Daniloff, in which Daniloff indicated that the money "needs now to be used." (Pl. Ex. 32.) Reuben noted that he told Daniloff that if he planned to use the money, Reuben would rather leave the project and take his money out. (See

12

id.) The following month, Reuben met with Daniloff in Cannes, France. There, Daniloff made another proposal -- converting the loan into equity for his venture so that he could use the money. (See also Pl. Ex. 35 at 3054.) Reuben testified that his position was that he would "rather take [his] money back if [Daniloff] want[ed] to convert [the money] to equity" and that he "want[ed] the loan to remain as a loan. That is how we agreed." (Tr. at 40:6-9.)

Following that discussion, Daniloff emailed Reuben, noting, among other things, that the initial funding of the partners, i.e., Reuben, "must be returned first" within two to three years. (Pl. Ex. 35 at 3054.) The parties discussed by phone and Daniloff followed up with Reuben via email to confirm that Reuben agreed to allow Daniloff to use up to $5 million for a chicken farm project in Russia. At trial, Reuben disputed that he agreed to the arrangement. But the email from Daniloff nonetheless demonstrates that Daniloff sought authorization from Reuben to use the loan proceeds, consistent with the terms of the Original Agreement.

D.   REPAYMENT OF THE LOAN

Daniloff was expected to repay the loan in full by December 4, 2013. (See Tr. at 56:5-17; Pl. Ex. 54 at 2301.) Reuben's son, Jamie Reuben ("Jamie"), became involved in

13

Bloomfield's $25 million transaction in the middle of 2013, several months before Daniloff was to repay Reuben. By email, on July 2, 2013, Jamie wrote Daniloff, memorializing a conversation they had together, breaking down how Daniloff allocated the proceeds from Bloomfield. Reuben responded to the email, copying Daniloff, indicating that he "did not authorize this as detailed." (Pl. Ex. 40 at 4060.) Reuben further wrote: "The deal was as follows. For us putting 25 m[illion] dollars in escrow to be shown as equity but cannot be used[,] we got 25 percent of the company." (Id.) Reuben explained that he made a loan and not an investment because "[o]therwise for putting up nearly all the capital I would have demanded the majority of the shares. But because I was not knowledgeable of the business I did not want to go further than the escrow of the 25 m[illion] dollars so we would be paid out by now." (Id.) Reuben reiterated the arrangement between him and Daniloff, and at no point in the email correspondence did Daniloff dispute Reuben's recitation of their agreement.

In August 2013, an email between Jamie and Daniloff showed that Daniloff planned to return at least $16.5 million of the $25 million to Reuben by the year's end. (See Pl. Ex. 48.) Daniloff stated: "I confirm that the plan to return 16.5

14

million is correct, and as of now, there are no deviations to the plan." (Id.) From November 2013 to January 2014, Daniloff discussed with Reuben's team a means of securing repayment after he raised more funds. Daniloff was unable to repay Bloomfield the $16.5 million by the end of 2013, but his repayment plan now involved "rais[ing] euro bonds up to $100 million, and [taking] up $30 million at the interest rate of 8 percent." (Pl. Ex. 274; Tr. at 57:5-7.) Reuben restated in an email that his priority was to "get back to our original agreement. That is, that our investment and accrued interest be returned as soon as possible." (Pl. Ex. 274; Tr. at 58:4-8.) When Reuben stated the terms of the Original Agreement, Daniloff neither rejected nor disputed the existence or terms of that agreement.

In June 2014, Reuben learned from Orkin that the roughly $30 million that Daniloff raised that was supposed to be paid to Bloomfield was being transferred to other companies or placed at Razvitie Bank, a Russian bank facing bankruptcy. He also learned that the funds would be allocated for other projects including a "pig farming operation." (Pl. Ex. 40 at 4061.) Reuben again repeated to Daniloff by email that the $25 million he contributed was supposed to be held only in escrow and not used. Reuben wrote that he "would not ha[ve]

15

invested this kind of money without considerable diligence" and that he provided the money as a loan because it was guaranteed to be safely and promptly returned. (Pl. Ex. 64 at 2845.) He also expressed concern over the money placed at the Russian Razvitie Bank because it was likely to become insolvent which would lead to a "loss of cash." (Id. at 2844.)[4]

Concerned with Daniloff's inability to repay the loan, Reuben directed his team to help Daniloff fulfill his obligations. Reuben engaged Mehmet Saydam ("Saydam") to take lead on ensuring repayment and finding ways to support Daniloff's venture. Saydam first joined Reuben's team in 2012. In or around November 2013, Reuben designated Saydam as point person on his arrangement with Daniloff in order to help Daniloff raise new capital so that he could repay Reuben.

Saydam's understanding of the initial arrangement between Daniloff and Bloomfield was the same as Reuben's -- that Reuben loaned Daniloff $25 million, which would remain in escrow in a separate bank account controlled by Reuben, that Reuben would obtain 50 percent of UMG as collateral, and upon full repayment, Reuben's shares would be reduced to 25

---

[4] Bloomfield established at trial that Razvitie Bank where Daniloff had held some of UMG's money ultimately had its license revoked and went bankrupt, as Reuben forewarned.

16

percent. Saydam worked closely with Daniloff to develop structures to repay the $25 million loan until Bloomfield took legal action in 2015. According to Saydam, during their many interactions, Daniloff never disputed that the $25 million was a loan that was expected to be repaid in full. Throughout their discussions on repayment, Daniloff would often propose a structure and then later rescind that suggestion. The parties' updated expectation was that Daniloff would repay the loan by October 9, 2014 (see Pl. Ex. 81 at 3085), but Daniloff again failed to meet the deadline. The discussions about raising additional funding with the promise to repay Reuben eventually culminated in an in-person meeting in Moscow in November 2014.

Daniloff, Saydam, Zalko, Orkin, Bendersky, and Dan Gould ("Gould") attended a meeting in Moscow, Russia on November 26, 2014. On that occasion, the participants discussed the means by which Daniloff would repay the $25 million loan. The meeting was memorialized in writing (the "November 26 Modification"), and was signed by all the parties in attendance, including Daniloff. The participants at that meeting decided to put the agreement for repayment in writing so as "not to have things up in the air." (Tr. at 536:24.)

17

The November 26 Modification included seven clauses marked from "0" to "6," laying out how Daniloff would repay Bloomfield the $25 million. The terms included, among other things, that Reuben would be repaid in full by December 15, 2014; that a back-to-back loan would be used to repay Reuben; and that Reuben would ultimately end up with 25 percent of UMG. The structure of the repayment plan was proposed by Daniloff, and the parties never expressed any doubt that the November 26 Modification would be binding. That same day, Saydam emailed the Bloomfield representatives, including Reuben, a summary of the items that were agreed upon at the in-person Moscow meeting.

At trial, Daniloff characterized the November 26 Modification as a way to appease a "disappointed investor" (Id. at 438:21) and testified that he was merely trying to find a way to provide Reuben a return on investment. Daniloff further testified that the agreement was only a term sheet or a set of discussion points, not an "agreement about anything" because of the uncertainty regarding the seventh term, marked Clause 6. (Id. at 437:23-438:9.) Clause 6 concerned the role that Gould would have with UMG after repayment and was notated with "TERMS 2B proposed and agreed." (Pl. Ex. 103.)

18

Yet, the trial testimony and evidence presented demonstrate that Daniloff acted consistently with the November 26 Modification being binding upon him. For example, Saydam contacted Daniloff in December 2014 confirming that Daniloff would get his passport certified by the U.S. embassy as part of the KYC, or "Know Your Customer," procedure at the Demir-Halk Bank ("DHB Bank") in the Netherlands, which is where the parties now planned to hold Reuben's funds in escrow. (Pl. Ex. 108 at 3178.) Daniloff emailed Saydam that he scheduled an appointment with the embassy, demonstrating his attempt to comply with the procedure. (See id.)

Nevertheless, the loan was not repaid by December 15, 2014 as required by the November 26 Modification. On December 23, 2014, Daniloff emailed Orkin, proposing partial repayment of $15 million instead of the full $25 million, and noting that the $15 million would be held at DHB Bank in the Netherlands. Orkin responded to Daniloff that they had "planned and agreed to pay David 25 million, not 15 million." (Pl. Ex. 112 at 145.) Daniloff did not disagree with Orkin and replied, "I'm hoping that you will support me; David will agree to 15 million." (Id.)

Roughly around December 2014, Daniloff also proposed a $2 million repayment, which he referred to as a "redemption."

19

(See Pl. Ex. 117.) Unlike a typical redemption, however, Daniloff's "redemption" was not dependent on the value of any shares but instead based on the amount of cash Daniloff had available. (See Tr. at 549:8-23.) According to Saydam, such a "redemption" would not dilute Bloomfield's shares until full repayment is achieved after which Bloomfield's shares would be reduced to 25 percent as the parties agreed. (See id. at 550:5-10.) However, in a December 2014 email between the parties, when Daniloff suggested that the parties obtain the money through the redemption mechanism, Bloomfield, through Saydam, rejected the option, to which Daniloff responded "OK." (Pl. Ex. 117; see Tr. at 590:5-591:9.)

Having failed to repay Reuben by December 15, 2014, Daniloff promised Bloomfield via email that the funds would be repaid by December 29, 2014, and then by January 9, 2015. Reuben was not repaid by January 9, 2015.

In January 2015, Jamie along with Reuben's brother, Simon Reuben ("Simon"), became more involved in the matter after Daniloff's repeated failures to fulfill his obligations. (See id. at 559:22-560:14.) In an email chain with Bloomfield's representatives that included the Reuben Brothers, Jamie, Saydam, Bushaev, and O'Driscoll, the terms of the Original Agreement were recounted.

20

Saydam testified that because Daniloff seemed unlikely to honor the Original Agreement, Reuben's team brainstormed possible solutions in the event that the parties needed to pursue legal recourse. Because of the technicality of the loan proceeds being taken into an investment fund and based on the written documents available, Saydam considered that the redemption procedure might be the only available option to achieve some of the repayment. (See Pl. Ex. 130; Tr. at 563:1-10.)

E.    THE NETHERLANDS LITIGATION

On January 20, 2015, Daniloff emailed Reuben, Jamie, Saydam, and Orkin stating that while he looked for "a workable solution," he would give Bloomfield a second signature on the UMG account at ING Bank, the same arrangement as indicated in the Original Agreement. (Pl. Ex. 135 at 8798; Tr. at 265:20-23.) Eventually, however, upon Saydam's suggestion, the funds were to be transferred to the DHB Bank in the Netherlands. (See Pl. Ex. 138.)

In April 2015, Daniloff proposed a two-part repayment structure -- one for $15 million and another for $2 million -- which Saydam memorialized in an email to Daniloff, Orkin, Reuben, and Jamie. (See Pl. Ex. 147.) Daniloff transferred $15 million to the DHB Bank over which each Bloomfield and

21

Daniloff were signatories. On May 18, 2015, Bloomfield received $2 million from Ovester, on behalf of Daniloff.[5]

From June 10 to 11, 2015, Reuben and Daniloff exchanged emails regarding the return of the loan. Daniloff expressed his inability to return the money immediately because he needed to "get [the] project going and can't stop," which Reuben indicated was "unacceptable." (Pl. Ex. 154 at 24322.) In his emails to Daniloff, Reuben again recited the terms of the Original Agreement and that he wanted his money released immediately. (See id. at 24321-22.) Daniloff did not refute that representation and in fact acknowledged that he would "return [Reuben's] money" and that he "need[ed Reuben's] permission and blessing to move forward" with his projects. (Id. at 24321.)

At trial, Bloomfield established that on or about June 15, 2015, Saydam received a call from DHB Bank alerting him that UMG was attempting to remove Bloomfield's signatory

---

[5] With respect to the $2 million, Daniloff proposed that Ovester, an investor in the Synergy Funds, redeem a certain number of units amounting to $2 million. Bloomfield would then sell the equivalent of half the number of shares Ovester redeemed for $2 million, which would reestablish Bloomfield retaining 50 percent of the shares of UMG until the loan would be fully repaid. (See Pl. Ex. 147.) Daniloff caused the repayment of the $2 million on May 15, 2015, and it was received on May 18, 2015. (See Pl. Ex. 272.) The $15 million that Daniloff proposed would be given to Reuben as a pledge, and held at the DHB Bank in the Netherlands, until the remainder of the now $23 million would be repaid. (See Pl. Ex. 147; Tr. at 578:6-12.)

power over the DHB account that held the $15 million funds. Though the account had two signatories -- one of which was O'Driscoll's on behalf of Bloomfield -- Zalko, on behalf of UMG, attempted to cancel O'Driscoll's signatory power on the DHB account in order to withdraw money from the bank without Bloomfield's permission. As a result of the attempted cancellation, on or about June 16, 2015, Bloomfield initiated an action to enjoin Daniloff's transfer of the UMG money in the Netherlands.

On or about June 19, 2015, Reuben wrote to Daniloff, recounting the terms of the Original Agreement, Daniloff's repeated breaches of the agreement, Daniloff's promises to Reuben, and the events that led to Bloomfield filing and being granted an injunction restraining Daniloff from transferring the Bloomfield money in DHB Bank. (See Pl. Ex. 156 at 5447-49.) Several days later, on or about June 22, 2015, Daniloff replied to Reuben's email representing for the first time: that the operative agreement controlling the transfer of the $25 million was the Subscription Agreement and its related documents (such as the Private Placement Memorandum or "PPM"); that the $25 million was not a loan but an investment; that recovery of any amount from the Synergy Funds could be achieved only through the redemption procedure; and that

23

Daniloff had retained legal counsel. (See id. at 5447.) This email constituted the first time Daniloff represented that the $25 million was an actual investment in the Synergy Funds, and not a loan, and that the Subscription Agreement actually governed the parties' relationship with respect to how the $25 million would be used.

Subsequent to and despite Daniloff's June 2015 email, the parties still engaged in discussions and negotiations regarding full repayment of the $25 million. Though Bloomfield sought full repayment and had taken legal action, it was still committed to ensuring UMG's survival because pursuant to the Original Agreement, Bloomfield would ultimately retain 25 percent of UMG once Daniloff had paid back the loan. The parties discussed a restructuring of UMG that would provide a certain sum of money to Bloomfield, but the restructuring ultimately did not occur.

In addition to the $2 million repayment that Daniloff made on May 15, 2015, Bloomfield received $4.5 million from Daniloff on December 2, 2016. This $4.5 million came from an escrow account following a settlement of the Netherlands litigation. Though the payment was described as a "redemption" by Daniloff and in the financial statements of the Synergy Funds (see Tr. at 445:24-25, 446:4; Pl. Ex. 165 at 7461,

7480), the $4.5 million in form and substance was not a "redemption" but a repayment and did not originate from the Synergy Hybrid Feeder Fund directly (see Tr. at 586:2-11).

## F.   DANILOFF'S CREDIBILITY

The Court found throughout the trial that Daniloff was not a credible witness. His testimony was often inconsistent or contradictory and his explanations unpersuasive. He maintained that the $25 million was never a loan even when confronted with emails in which he confirmed an obligation to repay Bloomfield, and either affirmed or failed to deny the terms of the Original Agreement. He frequently claimed he was not able to remember salient events that occurred throughout this saga, and that were vital to the parties' agreement. For example, he claimed he did not remember that the $25 million was to be kept in a restricted bank account over which Bloomfield would have signatory control -- details of which were manifestly critical to the underlying transaction and had been memorialized in multiple email correspondences over the course of several years between the parties. (See, e.g., id. at 184:5-13.)

Further, at trial, Daniloff was confronted with clear evidence demonstrating that despite his purported disagreement, he failed to dispute any of Bloomfield's

25

recitation of the Original Agreement in the emails introduced into the record. Daniloff incredibly rationalized his failure to correct the parties' supposedly erroneous understanding by asserting that he "ha[d] no obligation to respond . . . because everything that was sent in [the emails] was absolutely incorrect." (Id. at 441:11-15.) Though Daniloff testified that the Subscription Agreement -- not the Original Agreement -- controlled the parties' relationship, and that the $25 million was never considered a loan and always an investment, the Court did not find that the testimony or evidence Daniloff presented was credible, or that it plausibly supported a finding embodying Daniloff's version of the material facts in dispute.

Bloomfield also established at trial that after obtaining control over the $25 million via the Synergy Funds, Daniloff regularly over-valued his funds in amounts exceeding $49 million between 2012 to 2016. This increase in the net asset value caused an increase in performance fees and management fees, resulting in roughly one million dollars in such fees being paid out to Daniloff through ED Capital each year.[6] Through those fees, in 2014, for example, $205,000 was

---

[6] Bloomfield also established at trial that Daniloff and ED Capital were investigated by the Securities and Exchange Commission (the "SEC") in 2019 and were subject to a cease-and-desist order pursuant to Sections

26

used to pay for travel; $248,000 was used to pay for travel and conferences; and $191,000 was personal to Daniloff. (Id. at 351:10-352:11; Pl. Ex. 96 at 21566.) Despite these increased annual fees -- fees used to cover Daniloff's expenses, business-related or otherwise -- Daniloff reported $0 in wages or negative income on his tax returns. (See, e.g., Pl. Exs. 209-226.) Notably, had the $25 million from Bloomfield gone directly to the ING Bank account where it would have been held in escrow for UMG, as agreed, instead of through the Synergy Hybrid Fund in the first instance, the fees paid to Daniloff and ED Capital would have likely been significantly less because of a lower net asset valuation.

## II.   CONCLUSIONS OF LAW

### A.   FRAUDULENT INDUCEMENT

Bloomfield claims that Daniloff is liable for fraudulent inducement. Specifically, Bloomfield alleges that Daniloff made a material misrepresentation to intentionally deceive Bloomfield into providing Daniloff with $25 million as a loan pursuant to the Original Agreement by using the Synergy Hybrid

---

203(e) and 203(k) of the Investment Advisers Act of 1940. According to the evidence presented at trial, ED Capital was found to have failed to distribute the annual audited financial statements of its investment funds in accordance with the generally accepted accounting principles to investors. Daniloff was found responsible for ED Capital's violations as the sole owner and managing member of ED Capital. The SEC censured ED Capital, which was required to pay a civil monetary penalty in the amount of $75,000.

Fund as a conduit for the proceeds. In New York,[7] to prevail on a claim of fraudulent inducement, the plaintiff must prove by clear and convincing evidence "(i) a material misrepresentation of a presently existing or past fact; (ii) an intent to deceive; (iii) reasonable reliance on the misrepresentation by [the complaining party]; and (iv) resulting damages." Ipcon Collections LLC v. Costco Wholesale Corp., 698 F.3d 58, 62 (2d Cir. 2012) (internal quotation marks omitted) (quoting Johnson v. Nextel Commc'ns, Inc., 660 F.3d 131, 143 (2d Cir. 2011)). The Court finds that Bloomfield produced clear and convincing evidence sufficiently proving that Daniloff fraudulently induced Bloomfield to enter into the Original Agreement by using the Synergy Hybrid Fund as a conduit for the loan proceeds to improperly obtain control over the $25 million that Bloomfield provided to Daniloff.

1. Material Misrepresentation

First, Bloomfield proved at trial that Daniloff made a material misrepresentation of a presently existing or past fact. Specifically, Daniloff represented that the $25 million loan provided by Reuben needed to be channeled through the Synergy Hybrid Fund in order to show equity for UMG to acquire

---

[7] The Court notes that the parties do not dispute that New York law applies to the claims asserted in this matter.

additional loans, but that the funds would remain a loan and be transferred to the ING Bank account over which Bloomfield would have signatory authority.

Ordinarily, in New York, a fraud claim is duplicative of a breach of contract claim, and therefore must be dismissed, where the claims "arise out of the same core events, relationship or transaction." Lam v. Am. Exp. Co., 265 F. Supp. 2d 225, 230 (S.D.N.Y. 2003). However, a fraud claim based on inducement to enter a contract can proceed if a plaintiff: "(i) demonstrate[s] a legal duty separate from the duty to perform under the contract; or (ii) demonstrate[s] a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek[s] special damages that are caused by the misrepresentation and unrecoverable as contract damages." Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 20 (2d Cir. 1996) (internal citations omitted); see also WIT Holding Corp. v. Klein, 724 N.Y.S.2d 66, 68 (N.Y. App. Div. 2001) ("[A] misrepresentation of material fact, which is collateral to the contract and serves as an inducement for the contract, is sufficient to sustain a cause of action alleging fraud.").

Here, the Court finds that Bloomfield may recover under a fraudulent inducement claim because Daniloff's

misrepresentations regarding the Synergy Hybrid Fund and the enforceability of the Subscription Agreement were collateral present statements of fact, extraneous to the Original Agreement, and used to induce Bloomfield to transfer $25 million to Daniloff via the Synergy Hybrid Fund. This transfer into the Synergy Hybrid Fund caused Daniloff to have exclusive control over the funds and use the money without Bloomfield's oversight in contravention of the Original Agreement.

Daniloff's theory of the case is that he never misrepresented that Bloomfield made an investment in the Synergy Hybrid Fund as an investor and that the $25 million did not represent a loan. However, the testimony presented at trial and the email evidence indicate otherwise. At trial, Reuben testified for Bloomfield that Daniloff expressly indicated to him that the $25 million needed to be shown as equity via the Synergy Hybrid Fund in order to borrow against it, even though the money was to be given as a loan. Reuben testified, "If I put the money in as a loan, . . . [Daniloff] could not raise money because there would be no money in the company for which to raise the loan. So, therefore, he wanted me to put it as a form of investment or equity so that he could go to a bank to get a loan[.]" (Tr. at 114:22-115:2.) Reuben further testified that Daniloff was concerned that

30

revealing Reuben's name in this venture would impede Daniloff's ability to obtain additional loans. Daniloff confirmed that, by investing in the fund, Reuben would be able "to protect his identity." (Id. at 182:16-20.)

Bloomfield also presented an email from O'Driscoll to Daniloff, confirming his understanding that the investment in the Synergy Hybrid Fund was "for visibility purposes" but that "in reality, the investment is not sitting in the fund." (Pl. Ex. 12.) Daniloff did not dispute O'Driscoll's characterization of the arrangement. Relying on Daniloff's representations and omissions, Bloomfield executed the Subscription Agreement for the Synergy Hybrid Fund on November 3, 2011 in order to effectuate the transfer of the $25 million into the fund. Though Bushaev signed the Subscription Agreement on behalf of Bloomfield, Bloomfield did not believe that the document would be legally binding nor did Daniloff present it as so. However, by putting the $25 million in the Synergy Hybrid Fund in the first instance, Daniloff was able to have unfettered access to and control over the money without Bloomfield's authorization and oversight.

Daniloff argues that he did not make any misrepresentation because he always maintained that the $25

31

million was an investment and not a loan, which would thus allow him to unilaterally use the funds. Daniloff presented an executed memorandum of understanding (the "MOU") between the parties that was drafted some time before September 15, 2011. (See Def. Ex. C.) The document refers to a "potential Reuben investment in Synergy Hybrid Fund" with no mention of a loan. (Id.) However, while this document labels the $25 million as an "investment," the MOU along with an earlier draft of the MOU contemplates that "Reuben will recover its $25 million over time via trading, and the shareholding in [the Synergy Hybrid Fund] will be diluted to 25 percent accordingly." (Def. Ex. C; Pl. Ex. 256.) The document also noted that "Reuben BVI will be controlling the cash management of [UMG] until the $25 million investment is recovered." (Def. Ex. C; Pl. Ex. 256.) The Court finds that despite referring to the $25 million as an "investment" into the Synergy Hybrid Fund, the proceeds actually functioned as a loan. With an investment, there is no guarantee that an investor will "recover" the same amount it invested over time nor does an investor have control over his invested funds. Moreover, the terms are consistent with the Original Agreement, which provided that Bloomfield's shares in UMG would be reduced to 25 percent upon full repayment of the purported loan.

32

Also, as the Court discusses below, email correspondences between the parties starting in 2011 through 2015 reveal that the parties, including Daniloff, always operated with the understanding that the $25 million constituted a loan, subject to full repayment and consistent with the Original Agreement, and not an investment. At no point until he retained counsel in 2015 did Daniloff assert that the funds could be recouped only through the redemption procedure prescribed by the Subscription Agreement.

Further, Daniloff's misrepresentation to Bloomfield is made clear by the fact that, contrary to his representation, Daniloff immediately began using the funds once the transfer from Bloomfield was completed, the funds were used without Bloomfield's authorization, and the $25 million was not actually transferred to a segregated bank account at ING Bank, over which Bloomfield was to have signatory authority.

2. <u>Intent to Deceive</u>

Second, Bloomfield proved that Daniloff had an intent to deceive. This intent is evinced from the events that transpired upon Bloomfield's transfer of the $25 million to Daniloff via the Synergy Hybrid Fund. Bloomfield established at trial that despite the parties' Original Agreement which provided that the $25 million would be transferred to a

separate account at ING Bank and that the funds would remain untouched unless Bloomfield expressly authorized the transaction, once the funds were cleared for use on December 22, 2011, Daniloff immediately began dispensing with the money without Bloomfield's knowledge.

At trial, Bloomfield presented evidence that once the Synergy Hybrid Fund received the $25 million unblocked, Daniloff immediately directed his team to wire roughly $10 million to a UMG bank account at SberBank, pay fees owed to Apex, the Synergy Hybrid Fund's administrator, and to ED Capital, of which Daniloff is the sole owner and manager, and hold the remaining funds in the Synergy Hybrid Fund's account at HSBC Bank. At no point were the funds transferred to the ING Bank account that the parties had set up to hold the money in escrow. And at no point did Daniloff apprise Bloomfield that the funds were being used in this manner.

That Daniloff intended to deceive is also apparent when considering the emails between Webb, on behalf of Bloomfield, and Daniloff in which Daniloff continued to withhold information from Bloomfield, namely that he had already begun using the funds. The emails showed that Webb believed the funds were transferred or would be transferred to the ING Bank account as agreed, and Daniloff affirmed that

34

understanding. Additionally, though several years later, Daniloff attempted to eliminate Bloomfield as a signatory to the DHB Bank account, which would permit Daniloff to use the money without authorization. Bloomfield only learned of Daniloff's attempt to remove its signatory control when contacted by a representative of DHB Bank, and not from Daniloff himself, further evincing an ongoing intent to deceive Bloomfield.

The Court does not find Daniloff's argument that he had no intent to deceive persuasive. At trial, Daniloff attempted to explain that he lacked an intent to deceive because his use of the proceeds was pursuant to and consistent with the Subscription Agreement. However, shortly after Bloomfield transferred the proceeds to the Synergy Hybrid Fund, Daniloff reorganized the fund into the Synergy Hybrid Feeder Fund (for which no subscription agreement signed by Bloomfield exists). Daniloff regularly over-valued his investment fund, which allowed him, through ED Capital, to acquire higher management and performance fees annually. Daniloff also allegedly made extravagant purchases of luxury vehicles for himself and family members. Even if, as Daniloff contends, Bloomfield's understanding of their arrangement as a loan agreement was mistaken, Daniloff consistently failed to correct

Bloomfield's supposedly mistaken belief about the nature of the funds and how they would be used, despite being regularly made aware of their beliefs over the course of nearly four years. Further, as explained below (see *infra* Section II.B), even if Daniloff's use of the $25 million was aligned with the Subscription Agreement, the Subscription Agreement was not the operative agreement that governed the parties' relationship.

Thus, Daniloff was fully aware of Bloomfield's expectations about how the proceeds would be used, yet immediately began spending the money to pay for various expenses unrelated to UMG, without Bloomfield's knowledge and consent, and in contravention of the Original Agreement. Daniloff also regularly withheld information about or misrepresented entirely the whereabouts of the proceeds and how they would be handled. Accordingly, the Court finds that Daniloff had a present intent to deceive Bloomfield into transferring $25 million through the Synergy Hybrid Fund in order to allow Daniloff to dispense of the funds in a manner contrary to the Original Agreement.

3. Reasonable Reliance

Third, Bloomfield has demonstrated that its reliance on Daniloff's misrepresentations was reasonable. Determining

36

reasonable reliance is a "fact-intensive" inquiry. Schlaifer Nance & Co. v. Est. of Warhol, 119 F.3d 91, 98 (2d Cir. 1997). "Courts in this [D]istrict 'consider the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them.'" Sothebys, Inc. v. Thut, No. 21 Civ. 6574, 2022 WL 3351534, at *11 (S.D.N.Y. July 28, 2022), report and recommendation adopted, No. 21 Civ. 6574, 2022 WL 3354674 (S.D.N.Y. Aug. 12, 2022) (quoting Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc., 343 F.3d 189, 195 (2d Cir. 2003)); see also JP Morgan Chase Bank v. Winnick, 350 F. Supp. 2d 393, 406 (S.D.N.Y. 2004) ("New York takes a contextual view, focusing on the level of sophistication of the parties, the relationship between them, and the information available at the time of the operative decision."). However, "[a] plaintiff cannot close his eyes to an obvious fraud, and cannot demonstrate reasonable reliance without making inquiry and investigation if he has the ability, through ordinary intelligence, to ferret out the reliability or truth about" the defendant's conduct. Crigger v. Fahnestock & Co., Inc., 443 F.3d 230, 234 (2d Cir. 2006).

Bloomfield argues that its reliance was reasonable because Daniloff's rationale for using the Synergy Hybrid

Fund as a "conduit" made sense to Reuben, who had routinely entered into large-scale deals in Russia on "oral agreements alone." (Pl. Pre-Trial MOL at 6.) Also, at trial, Reuben testified that he relied on Orkin's recommendation that Daniloff was a trustworthy person and Orkin's guarantee that he would monitor the transaction. Daniloff contends that Bloomfield's reliance on Daniloff's representations was not justifiable because Reuben is a sophisticated businessman, and "where sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance." (Def. Pre-Trial MOL at 6-7 (quoting Grumman Allied Indus., Inc. v. Rohr Indus., Inc., 748 F.2d 729, 737 (2d Cir. 1984)).) Daniloff further argues that the Subscription Agreement and PPM expressly contemplate that the funds would be used as an investment by disclosing the responsibility and assumption of risk investors had with respect to their investments.

The Court concludes that Bloomfield's reliance on Daniloff's representations was justifiable when viewed in the context of the entire transaction. Daniloff made a convincing proposal to Reuben that transferring the funds through the

Synergy Hybrid Fund would show equity on the books of UMG, allowing Daniloff to acquire additional loans and protect Reuben's identity in Russia so that he would not be targeted by other Russian banks to be a guarantee. Further, Daniloff did not dispute Bloomfield's understanding that the transfer of the money through the Synergy Hybrid Fund was "for visibility purposes" -- for optics -- and the proceeds would not sit in the fund. (Pl. Ex. 12.) And, though the agreement was an oral one, it was consistent with the types of oral transactions and handshake agreements Reuben had entered into before in Russia, a circumstance confirmed by Saydam at trial.[8]

Additionally, the Court considers the close personal and familial relationship between the parties involved as another factor demonstrating that Reuben's reliance was justifiable in that they were not merely working together at an arm's length. That a plaintiff has a "'long-standing close, personal relationship' with the individual who allegedly made fraudulent statements, as opposed to an 'arms length relationship between client and service provider . . . may well bolster the [plaintiff's] . . . argument that [his] . . .

---

[8] Saydam provided credible testimony that Reuben regularly entered into oral loans, amounting to roughly 20 loan agreements to date, with an estimated $3.5 billion loan portfolio. (See Tr. at 599:13-600:9.)

reliance was reasonable.'" <u>Abbey v. 3F Therapeutics, Inc.</u>, No. 06 Civ. 409, 2011 WL 651416, at *7 (S.D.N.Y. Feb. 22, 2011), <u>aff'd</u> <u>sub</u> <u>nom.</u> <u>Abbey v. Skokos</u>, 509 F. App'x 92 (2d Cir. 2013) (alterations in original) (quoting <u>Parsons & Whittemore Enter. Corp. v. Schwartz</u>, 387 F. Supp. 2d 368, 374 (S.D.N.Y. 2005)).

The Court finds here that Bloomfield, via Reuben and Orkin, and Daniloff had a uniquely close and personal relationship. Reuben was introduced to Daniloff through Orkin, who shared cultural ties with Daniloff and treated Daniloff like family because Daniloff was childhood best friends with Orkin's son-in-law, Bendersky. Though Reuben did not have a previous relationship with Daniloff, Reuben had a long-standing and ongoing business relationship with Orkin that dated back to the 1990s. Orkin worked for various Reuben-affiliated companies, and Reuben had previously entrusted Orkin with a "difficult job" in Taiwan which he performed "very well," by executing all of their commitments, and in turn establishing a deeper trust. (Tr. at 8:16-25.) Reuben thus placed great trust and confidence in Orkin when he considered getting involved in Daniloff's project. Orkin further vouched for Daniloff as "a family member," and promised that they would work on this project together. (<u>Id.</u>

40

at 18:20-21.) Reuben also testified that upon meeting Daniloff in person in 2011, he found Daniloff to be capable and trustworthy, and considered inviting Daniloff to work on Reuben's own projects.[9] Since Daniloff first pitched his UMG project to Reuben in 2011, Daniloff, Reuben, Orkin, and other representatives of both parties communicated frequently and consistently over the course of years, and met regularly in different parts of the world to discuss the UMG project and the loan.[10] The Court thus finds that the family-like relationship and cultural ties among the various parties made Reuben's dealing with Daniloff at an arm's length more challenging, and gave Reuben reason to trust and rely on Daniloff's oral promises.

Further, the Court finds that Bloomfield's reliance on Daniloff's misrepresentations was reasonable because Daniloff behaved as though the parties' understanding of the arrangement was aligned. Since the beginning of their relationship until the Netherlands litigation began in 2015,

---

[9] Saydam testified that Reuben "really trusted Elliot [Daniloff], really, really, really trusted, until extremely, extremely late" and that Reuben viewed Daniloff as "a younger version of himself." (Tr. at 511:16-17, 511:20-21.)

[10] Shortly before the Netherlands injunction, in June 2015, Reuben emailed Daniloff demanding that his money be returned. Appealing to his and Reuben's close relationship, Daniloff replied, "You told me that I should call you or come to you like a father for [] help if I needed" (Pl. Ex. 154 at 24321), further evincing the familial nature of their relationship.

the parties exchanged numerous emails and held multiple in-person and phone conversations about the original loan arrangement. Notably, Daniloff characterized his discussions with Bloomfield as "unsuccessful attempts to correct [] Reuben's unfounded belief that he or Bloomfield made a loan to [] Daniloff." (Def. Pre-Trial MOL at 9.) However, neither the testimony nor the evidence presented at trial supports Daniloff's contentions. For example, after the money was transferred, when Bloomfield, through its representatives, emailed Daniloff about his repayment obligation or opening a bank account with Bloomfield as a signatory, Daniloff at no point represented that their understanding was incorrect, and instead affirmed their understanding or took actions consistent with the Original Agreement, such as connecting Bloomfield with Zalko to set up a bank account with ING Bank. Despite Daniloff's argument that any reliance was unreasonable because Reuben is a "sophisticated businessm[a]n" (Def. Pre-Trial MOL at 6), the other documents support the notion that the parties were outwardly aligned with respect to the arrangement. Though Daniloff offered the MOU signed in September 2011 to show that no misrepresentation was made because the money was an "investment," the Court finds that the document supports that the money actually operated as a

42

loan. Despite the MOU referring to the money as an "investment," as the Court discussed earlier, the document contemplated that Reuben would recover his $25 million over time and that his shares would be reduced to 25 percent, as agreed. The document further contemplated that Reuben would control the money at UMG until his money was fully recovered. (See Def. Ex. C.) Moreover, that the money was characterized as an "investment" is consistent with Daniloff's representations to Reuben that the funds needed to be shown as equity on the books of UMG for the purposes of appearances with banks or regulators.

The Court thus finds that Bloomfield proved reasonable reliance at trial. This is true in light of Reuben's prior practices of foregoing business formalities such as putting a loan agreement in writing, the more intimate nature of the parties' relationship, Bloomfield's request for assurances, and Daniloff's subsequent representations to Bloomfield and concrete steps taken indicating that both parties were operating pursuant to the terms of the Original Agreement.

4. Damages

Lastly, Bloomfield suffered damages because of Daniloff's misrepresentations and deceptions. Bloomfield argues that it can recover for fraudulent inducement because

Daniloff's misrepresentations constitute "collateral present statements of fact" that would entitle it to damages notwithstanding its breach of contract claims. (Pl. Pre-Trial MOL at 7 (quoting <u>Deerfield Commc'ns. Corp. v. Chesebrough-Ponds, Inc.</u>, 502 N.E.2d 1003, 1004 (N.Y. 1986)).) Daniloff counters that Bloomfield suffered no damages because Daniloff did not make any misrepresentations upon which Bloomfield detrimentally relied.

The Court disagrees and finds that Bloomfield did suffer damages because of Daniloff's fraudulent inducement. Relying on Daniloff's misrepresentations regarding the use of the Synergy Hybrid Fund and the enforceability of the Subscription Agreement, Bloomfield transferred $25 million to the Synergy Hybrid Fund under the impression that the money constituted a loan that would be subject to Bloomfield's control and repaid within two years. Instead, by reason of Daniloff's intentional deceptive maneuvers, Bloomfield unknowingly lost any control over the money because it was out of its reach in the Synergy Hybrid Fund, and Daniloff, contrary to the terms of the Original Agreement, spent a substantial portion of the funds without Bloomfield's authorization.

Despite Bloomfield accommodating Daniloff by considering alternative repayment plans and extending deadlines, the loan has not been fully repaid. In all, Bloomfield was repaid only $2 million in May 2015 and $4.5 million in December 2016, leaving an outstanding amount of $18.5 million. Bloomfield has established that it suffered damages in the amount of $18.5 million and related interest on account of Daniloff's fraudulent inducement.

Bloomfield seeks both compensatory and punitive damages in this matter, and the Court finds that both are appropriate. With respect to compensatory damages, however, as Bloomfield will be adequately compensated for the loss it suffered through its breach of contract claims (see infra Section II.B), the Court will not award duplicative compensatory damages stemming from the same transaction.

Bloomfield argues that it is also entitled to punitive damages for Daniloff's fraud in the inducement claim. For this purpose, Bloomfield seeks an amount equivalent to its compensatory damages because Daniloff's conduct was "gross, wanton, or willful." (Pl. Pre-Trial MOL at 15 (quoting Langenberg v. Sofair, No. 03 Civ. 8339, 2006 WL 3518197, at *5 (S.D.N.Y. Dec. 7, 2006)).) In New York, punitive damages are generally not available for ordinary breach of contract

45

cases. <u>See</u> <u>Rocanova v. Equitable Life Assur. Soc. of U.S.</u>, 634 N.E.2d 940, 943 (N.Y. 1994). However, such damages are recoverable "where the breach of contract also involves a fraud evincing a 'high degree of moral turpitude' and demonstrating 'such wanton dishonesty as to imply a criminal indifference to civil obligations,'" and "the conduct was 'aimed at the public generally.'" <u>Id.</u> (quoting <u>Walker v. Sheldon</u>, 178 N.E.2d 497, 499 (N.Y. 1961)); <u>see</u> <u>also</u> <u>id.</u> at 498-99 (noting that punitive damages may be recovered where the fraud is "aimed at the public generally, is gross and involves high moral culpability").

Though New York courts have articulated a public aim requirement, Bloomfield argues that it need not prove that Daniloff's conduct harmed the general public to be awarded punitive damages and that it need only prove that Daniloff's conduct was gross, wanton, or willful because the contractual relationship between the parties began at the same time as the fraudulent inducement. <u>See</u> <u>Langenberg</u>, 2006 WL 3518197, at *5.

Courts in this District have considered circumstances in which a public aim showing is not required to support an award of punitive damages. In <u>Langenberg</u>, which Bloomfield relies upon, the plaintiff alleged that the defendant breached a

46

contract and defrauded the plaintiff by making material misrepresentations about "his personal, professional, and educational background, as well as the reasons that he wished to control [the plaintiff's] investment portfolio." Id. at *3. As a result of the defendant's misrepresentations, the plaintiff relied on the statements and allowed the defendant to control her assets, causing her to lose a substantial amount of money. See id. The court determined that punitive damages was appropriate without requiring public harm because the New York Court of Appeals in Rocanova contemplated the public harm requirement only in cases where the tort arises directly from an existing contractual relationship. See id. at *4. In Langenberg, the parties did not have a prior contractual relationship until the plaintiff was fraudulently induced to enter into one. See id.

The Langenberg court also cited several cases by courts in this District analyzing the public aim requirement. For example, in Jones v. Dana, the court did not require a public harm when awarding punitive damages to a plaintiff where the defendant lied about her status as a financial advisor and history of success in order to obtain control over the plaintiff's inheritance. See No. 06 Civ 159, 2006 WL 1153358, at *26 (S.D.N.Y. May 2, 2006). The court found that even

47

without showing a public harm, a "very high threshold of moral culpability [was] satisfied" because the defendant "took advantage of the plaintiff" who was recently widowed and acted "under the guise of being [the p]laintiff's friend and trusted advisor[,] and then repeatedly covered up her actions so that they would not be discovered by [p]laintiff," warranting an award of punitive damages. Id.

The Langenberg Court also distinguished Topps v. Cadbury Stani S.A.I.C., 380 F. Supp. 2d 250, 266 (S.D.N.Y. 2005), another case in this District that assessed the public aim requirement for punitive damages. See 2006 WL 3518197, at *4. In Topps, the court required proof of a public wrong in a fraudulent inducement claim because the plaintiff's claim that it was fraudulently induced to amend an agreement, thus engendering the tort claim, arose "directly from a twenty-eight year contractual relationship." 380 F. Supp. 2d at 266.

These cases are instructive to the imposition of punitive damages here. As in Langenberg, Daniloff and Bloomfield did not have a prior long-standing contractual relationship at the time Daniloff fraudulently induced Bloomfield to making the $25 million loan through the Synergy Hybrid Fund. Instead, Orkin, who considered Daniloff family, introduced Reuben to Daniloff. Orkin and Reuben likewise had

a close relationship, which thus blurred the lines resulting in the parties dealing in closer proximity than at an arm's length. Taking advantage of this new relationship, Daniloff fraudulently induced Bloomfield to transfer the loan proceeds through the Synergy Hybrid Fund for optics, and to sign the Subscription Agreement in order to effectuate that transfer pursuant to the parties' oral loan agreement. By transferring the $25 million into the Synergy Hybrid Fund, Bloomfield lost any control it had over the funds, while Daniloff in turn had unfettered access to the money. Daniloff's immediate use of a substantial portion of the $25 million, which he had agreed with Bloomfield would remain untouched unless Reuben provided his express authorization, indicates that Daniloff never intended to fulfill his obligations and sought to take Bloomfield's money without consent.

Having considered the nature of the parties' relationship, the considerable amount of money at issue, and Daniloff's repeated deception and failures to return the funds over the course of years despite his constant representations to do so, the Court finds that Daniloff's conduct was indeed gross, wanton, and willful. Moreover, the Court considered that Daniloff used the funds for unauthorized purposes immediately upon their transfer to him

49

without the consent or knowledge of Bloomfield. With this money in his investment fund, Daniloff also repeatedly over-valued his fund, which resulted in higher administrative and management fees paid out to his company and himself. As the fraudulent inducement did not arise out of a long-standing relationship, and, indeed, Daniloff sought to leverage the newness and misplaced trust of his relationship with Reuben, the Court agrees with Bloomfield that a public harm showing is not required. Accordingly, the Court finds that an award of punitive damages in this action is warranted.

Though Bloomfield is entitled to punitive damages, the Court finds that punitive damages in an amount equivalent to the compensatory damages, as requested by Bloomfield, is excessive. Compensatory damages "are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct." State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 415 (2003). Punitive damages, on the other hand, "serve a broader function." Id. Such damages primarily aim "to punish the defendant and to deter him and others from similar conduct in the future." Vasbinder v. Scott, 976 F.2d 118, 121 (2d Cir. 1992). While the amount of a punitive damages award should be adequate to achieve those objectives, it "should not be so high as to result in

the financial ruin of the defendant." Id. And though
compensatory and punitive damages strive to serve different
purposes, in reality, significant overlap exists.[11] As the
Supreme Court noted in State Farm, "compensatory damages[ ]
already contain [a] punitive element." 538 U.S. 408, 426
(2003); see also Roginsky v. Richardson-Merrell, Inc., 378
F.2d 832, 841 (2d Cir. 1967) ("Many awards of compensatory
damages doubtless contain something of a punitive element,
and more would do so if a separate award for exemplary damages
were eliminated."). This is especially so in cases where the
compensatory damages award takes into consideration "damages
for severe injuries that cause the victim acute distress, and
arouse public anger and indignation." TVT Records v. Island
Def Jam Music Grp., 279 F. Supp. 2d 413, 424 (S.D.N.Y. 2003).
Thus, compensatory damages awards "may reflect some element
of relief that duplicates harm redressed by punitive
remedies, in particular when a compensatory verdict fully
redresses an injury." Id. at 450.

---

[11] See generally Andrew W. Marrero, Punitive Damages: Why the Monster
Thrives, 105 Geo. L.J. 767, 789 (2017) ("In practice, compensatory damages
embody elements and purposes that considerably overlap with the functions
and effects of punitive damages. In some circumstances, substantial
compensatory damages, as perceived either from the motive of the plaintiff
in commencing the litigation, or the impact a verdict of liability has on
the defendant, inherently contain a retributive component that operates
to inflict punishment and serve as deterrence in a manner not materially
different from the effects of punitive damages.").

Bloomfield relies on Koch v. Rodenstock, No. 06 Civ. 6586, 2012 WL 5844187 (S.D.N.Y. May 9, 2012), to argue for punitive damages in an amount equivalent to the compensatory damages. Koch, however, involved compensatory damages of only $311,486. The court in Koch further cited multiple cases where the punitive damages were a fraction of the compensatory damages and remarked that "[w]here higher compensatory damages have been awarded, the courts have more typically set punitive damages awards at lesser amounts." Id. at *12.

The Court agrees that where compensatory damages are particularly substantial, in order to avoid double punishment of the wrongdoer, a lower punitive damages award is appropriate. Here, the compensatory damages amount to $18.5 million plus prejudgment interest (see infra Section II.B), which is greater than the figures at issue in the cited cases by orders of magnitude. [12] While Daniloff's fraudulent representations to Bloomfield were indeed reckless and willful, and though his conduct resulted in a breach of trust and waste of time and resources, the injury to Bloomfield was

---

[12] In Langenberg, cited by Bloomfield, the court awarded punitive damages that was roughly 40 percent of the compensatory damages. See Langenberg, 2006 WL 1153358, at *1 (awarding $1 million in punitive damages where the compensatory damages amounted to $2,373,066). Similarly, in Jones, the court awarded punitive damages in the amount of $1 million where the actual damages amounted to $2,170,973. See Jones, 2006 WL 1153358, at *26.

chiefly economic. The compensatory damages award would thus provide full restitution to Bloomfield, and the aspects of an injury justifying a higher punitive damages award, such as those intangible, unquantifiable, and exceptional losses not fully covered by a compensatory damages award, are not entirely present here. Punitive damages that are equal to the compensatory damages would consequently be disproportionate to the harm imposed, and the imposition of such a penalty would seem to be driven by a desire to impoverish or paralyze, rather than deter, the offender. See TVT Records, 279 F. Supp. 2d at 452. Accordingly, the Court finds that given the substantial award of compensatory damages at $18.5 million, a punitive damages award of $1 million would adequately serve the purposes of retribution and deterrence, without subjecting Daniloff to duplicative punishment. Thus, the Court finds that Bloomfield is entitled to punitive damages of $1 million for its fraudulent inducement claim.

B.   BREACH OF THE ORIGINAL AGREEMENT AND NOVEMBER 26 MODIFICATION

Bloomfield argues that Daniloff breached both the Original Agreement and the November 26 Modification, which constitute existing and enforceable contracts. To establish breach of contract under New York law, "a plaintiff must prove, by a preponderance of the evidence, (1) the existence of a

contract between itself and [the] defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by [the] defendant; and (4) damages to the plaintiff caused by [the] defendant's breach." Oquendo v. CCC Terek, 111 F. Supp. 3d 389, 411 (S.D.N.Y. 2015) (internal quotation marks omitted) (quoting Diesel Props S.r.l. v. Greystone Bus. Credit II LLC, 631 F.3d 42, 52 (2d Cir. 2011)). Based on the evidence presented at trial, the Court finds that Bloomfield established that Daniloff breached the Original Agreement, which is a valid enforceable contract, and the November 26 Modification, which constitutes a modification of the Original Agreement, and that Bloomfield is therefore entitled to damages.

    1. Existence of a Contract

      a. The Original Agreement

    First, the Court finds that Bloomfield established that the Original Agreement constituted a valid oral contract between Bloomfield and Daniloff. In New York, contracts may be entered into orally. See Winston v. Mediafare Ent. Corp., 777 F.2d 78, 80 (2d Cir. 1985) (applying New York law). However, an oral agreement may not be enforced "unless there is a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect

to all material terms." Anderson v. Greene, 774 F. App'x 694, 697 (2d Cir. 2019) (internal quotation marks omitted) (quoting Kelly v. Bensen, 58 N.Y.S.3d 169, 172 (N.Y. App. Div. 2017)); see also Compania Sud-Americana de Vapores, S.A. v. IBJ Schroder Bank & Tr. Co., 785 F. Supp. 411, 428 (S.D.N.Y. 1992) (noting that courts consider "the objective manifestations of the intent of the parties as gathered by their expressed words and deeds" to determine existence of an oral contract). To determine whether the parties intended to be bound by an oral agreement, the Second Circuit considers: "(1) whether a party expressly required the agreement be in writing to be enforceable; (2) partial performance of the contract; (3) whether the parties agreed to all of the alleged contract terms; and (4) whether the agreement at issue is the type of contract that is usually written." Optionality Consulting Pte. Ltd. v. Nekos, No. 18 Civ. 5393, 2019 WL 4523469, at *4 (S.D.N.Y. Sept. 18, 2019) (citing Ciaramella v. Reader's Digest Ass'n, Inc., 131 F.3d 320, 323 (2d Cir. 1997)).

At trial, Bloomfield demonstrated that neither party required the Original Agreement to be in writing to be enforceable and deliberately decided not to have the agreement written down. Reuben testified credibly that

Daniloff did not want the agreement in writing out of concern that Reuben's name on the loan would attract the attention of guarantors and regulators, making it difficult for UMG to obtain additional loans from banks. This concern was one of the reasons Bloomfield ultimately agreed to channel the loan proceeds through the Synergy Hybrid Fund so that, for public perception purposes, the money would appear instead as an investment.

Bloomfield also proved through testimony and email evidence that the parties partially performed the contract. For example, Reuben, via Bloomfield, transferred the $25 million to Daniloff, which was completed on December 22, 2011. Representatives of Bloomfield, such as O'Driscoll, Webb, and Saydam, coordinated with representatives of Daniloff and UMG to set up a segregated bank account first at ING Bank and then at DHB Bank where the $25 million (and later $15 million) would be held in escrow, subject to Bloomfield's signatory control. Further, the terms of the Original Agreement required Reuben's authorization before the funds could be used, and Daniloff sought permission from Reuben regarding proposed uses of the funding on multiple occasions. Some of those instances included the Dear Colleagues email to Bloomfield, the reorganization of the Synergy Hybrid Fund on

March 5, 2012, the request made in July 2012 to convert the loan into equity, and the proposed use of up to $5 million for a poultry farm project. Daniloff also discussed and proposed various structures for repaying Bloomfield the entirety of the loan, consistent with the terms of the Original Agreement. As the Court notes below, the existence of the November 26 Modification, which altered some of the repayment terms, likewise evinces that some of the provisions of the agreement had already been performed.

Daniloff also effected partial repayment to Bloomfield. Although Daniloff contends that each repayment was a "redemption," consistent with the Subscription Agreement and PPM, the Court finds that Daniloff's theory lacks credibility. The amount of $2 million returned to Bloomfield in May 2015 was not based on a valuation of UMG shares, which would be required for a return on investment pursuant to a redemption. Nor was Bloomfield required to dilute its interest in UMG to receive the $2 million repayment. Instead, Daniloff used Ovester, another investor in the fund, to redeem units of the fund that would generate proceeds of $2 million. By Bloomfield selling back to Ovester roughly half of the number of UMG shares that Ovester had redeemed, Bloomfield was able to secure repayment of $2 million without reducing its

proportion of UMG shares. Thus, despite referring to the transaction as a "redemption," the $2 million paid to Bloomfield was simply a partial repayment of Bloomfield's loan, as it was made by Ovester, not the Synergy Hybrid Feeder Fund, and was based on the cash amount Daniloff had available, not on the value of UMG shares.[13]

Likewise, the $4.5 million that Daniloff repaid to Bloomfield on December 2, 2016 was not a "redemption" despite Daniloff's attempt to treat it as such. (See Tr. at 445:21-446:19.) The $4.5 million amount repaid to Bloomfield was made pursuant to an escrow agreement as a result of settling the Netherlands litigation. In short, according to this agreement, UMG would pay Bloomfield $3 million and undergo a restructuring. If these conditions were not met by the agreed-upon date, $4.5 million would be released to Bloomfield. Because Bloomfield was not paid by the deadline and the extended deadline, Daniloff paid Bloomfield in the amount of $4.5 million. Though this payment was represented as a "redemption" in the financial statements for the Synergy

---

[13] Though Ernest Israilov, a relative of Daniloff's, was the director of Ovester, Bloomfield established at trial that Daniloff had effective control over Ovester, allowing Daniloff to propose this mechanism to repay Bloomfield.

Funds, the evidence presented at trial does not support that characterization.

The Court also finds that the parties agreed to all of the terms of the contract, establishing a meeting of the minds. Reuben, Saydam, and Orkin credibly and consistently testified at trial that the terms of the Original Agreement included that Reuben would provide $25 million as a loan to Daniloff that would be repaid in approximately two years, that Reuben would receive 50 percent of UMG shares as security for the loan, which would be reduced to 25 percent upon full repayment, that the loan would be held at a segregated bank account over which Bloomfield would have signatory authority, and that any use of the loan proceeds would require Bloomfield's authorization. These terms were also memorialized in multiple emails beginning in 2011 when Bloomfield and Daniloff first entered into the agreement and well into 2015, when litigation began. Though the precise details regarding the mechanics of the repayment varied throughout the years, the essential terms remained constant. Bloomfield also presented emails at trial in which Daniloff attempted to amend the terms of the Original Agreement, attempts that were immediately rejected by Bloomfield. Daniloff's efforts to change the terms of the

agreement demonstrate that he was aware of and had agreed to the original terms.

Further, even if there was any ambiguity regarding the terms of the Original Agreement, which the Court does not find there to be, certain terms were again memorialized in the modification signed on November 26, 2014 in Moscow. The November 26 Modification, discussed below, reiterated Daniloff's obligation to repay a $25 million loan to Bloomfield.

Finally, the Court finds that the type of contract here is not always written down, especially when involving bonds of personal relationships of family, close friends, and business associates. Not infrequently, such oral agreements are closed by handshakes rather than by written and dated signatures. Reuben testified credibly that in his many dealings in Russia, he operated strictly on oral agreements, and that despite relying on oral agreements, his loans were invariably repaid.

The Court does not find credible Daniloff's argument that the Subscription Agreement and the corresponding PPM were the operative agreements governing the parties' relationship and that an oral loan agreement did not exist. At trial, Daniloff failed to present credible or compelling

evidence indicating the operative feature of the Subscription Agreement that served to govern the parties' relationship and the specific financial transaction they entered into. While the Court recognizes that the parties executed the Subscription Agreement, the agreement was both collateral to and not integrated into the original arrangement, and was never intended to take effect.

In New York, "[a]lthough parol evidence may not be admitted to contradict, vary, add to, or subtract from the terms of a written agreement, such evidence is admissible to show that 'a writing, although purporting to be a contract, is, in fact, no contract at all.'" Salzstein v. Salzstein, 894 N.Y.S.2d 510, 512-13 (N.Y. App. Div. 2010) (quoting Dayan v. Yurkowski, 656 N.Y.S.2d 689, 690 (N.Y. App. Div. 1997)); see also Paolangeli v. Cowles, 617 N.Y.S.2d 936, 938 (N.Y. App. Div. 1994) ("[T]he parol evidence rule does not bar the admission of parol evidence to show that what appears to be a contractual obligation is, in fact, no obligation at all.") (internal quotation marks and citation omitted).

Further, where a contract lacks a merger or integration clause, a court may examine "extrinsic evidence to prove the nature of their mutual promises." Starter Corp. v. Converse, Inc., 170 F.3d 286, 295 (2d Cir. 1999). In such instances, in

New York, "the court must determine whether the agreement is integrated 'by reading the writing in [] light of surrounding circumstances, and by determining whether or not the agreement was one which the parties would ordinarily be expected to embody in the writing.'" Bourne v. Walt Disney Co., 68 F.3d 621, 627 (2d Cir. 1995) (quoting Braten v. Bankers Trust Co., 456 N.E.2d 802, 804 (N.Y. 1983)). The Court must thus consider "'the type of transaction involved, the scope of the written contract' and the content of any other agreements asserted." Bourne, 68 F.3d at 627 (quoting Fogelson v. Rackfay Constr. Co., Inc., 90 N.E.2d 881, 883 (N.Y. 1950)).

Here, the Court does not find that the Subscription Agreement and the PPM were "intended to take effect." Salzstein, 894 N.Y.S.2d at 513 (citing Dayan, 656 N.Y.S.2d at 690). While the Subscription Agreement was executed to allow the $25 million to be put in the Synergy Hybrid Fund, that fund was to act only as a conduit so the Bloomfield money could then be transferred to a siloed bank account over which Bloomfield would have signatory authority.

The circumstances surrounding the writing, the email evidence, and the witnesses' testimony confirm that the parties entered into the Subscription Agreement to effectuate

the terms of the Original Agreement, and was not meant supersede the Original Agreement. Rather, the evidence persuasively demonstrated that the Subscription Agreement was meant as a means of securing the "visibility" or optics of the transaction that was actually embodied in the oral Original Agreement. (See Tr. at 145:4-15.)

As discussed above, both parties acted consistently with the terms of the Original Agreement and partially performed the contract, and often that conduct was in direct contravention of the principles of equity financing. For example, Daniloff conceded at trial that an investor normally does not manage or control his investment in a fund, and instead assumes the risk inherent in investment decisions. (See Tr. at 485:16-24.) Here, however, Daniloff regularly sought permission and authorization from Reuben directly regarding how the money would be used, giving Reuben the power to reject proposed uses of the funds. Such conduct is fundamentally inconsistent with financial principles and practices associated with capital investments. Moreover, the MOU that was signed by the parties in or before September 2011, also provided that Reuben would control the money he was supposed to provide to UMG, despite the MOU referring to

the money as an "investment." (Def. Ex. C; see Tr. at 487:6-17.)

Additionally, the actual repayments made to Bloomfield were not true "redemptions" in accordance with equity financing principles. At trial, Saydam recounted only one instance in December 2014, when Daniloff suggested that Bloomfield could be partially repaid via the redemption process, which Bloomfield promptly rejected. Saydam also testified that after the Netherlands litigation began, Daniloff's June 22, 2015 email to Bloomfield was the first time he asserted that the Subscription Agreement controlled the parties' relationship. However, even after Daniloff sent that email to Bloomfield, he behaved as though he were obligated to repay Bloomfield the $25 million in full. Though Daniloff contends that the $2 million and $4.5 million payments that Bloomfield ultimately received constituted a return on investment pursuant to the redemption process, those amounts were not true redemptions as they were not based on a valuation of UMG shares and Bloomfield's proportion of shares remained unchanged.

Also, Daniloff reorganized the Synergy Hybrid Fund into the Synergy Hybrid Feeder Fund in January 2012, causing Bloomfield's shares to be held in the new fund. However,

Daniloff failed to present evidence demonstrating that Bloomfield executed a subscription agreement for the Synergy Hybrid Feeder Fund, creating doubt as to what effect, if at all, the Subscription Agreement for the Synergy Hybrid Fund had on the $25 million, besides allowing the initial transfer into that investment fund.

Accordingly, the Court finds that the Subscription Agreement and its corresponding PPM are not freestanding binding contracts governing the parties' relationship and underlying $25 million transaction. Thus, the Court concludes that the Original Agreement, and not the Subscription Agreement, constitutes a valid, enforceable contract applicable in this action.

b. The November 26 Modification

Bloomfield alleges that Daniloff breached the November 26 Modification, which it argues is a separate, enforceable contract. Daniloff counters that, on the contrary, the November 26 Modification is not a contract that is binding on the parties because there was no meeting of the minds, and the document was merely a term sheet that contemplated further negotiation. The Court finds that the November 26 Modification did not constitute a separate contract independent of the Original Agreement but was instead a

modification of the Original Agreement, which Daniloff subsequently breached.

In New York, "parties may modify a contract 'by another agreement, by course of performance, or by conduct amounting to a waiver or estoppel.'" Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 783 (2d Cir. 2003) (quoting CT Chems. (U.S.A.) Inc. v. Vinmar Impex, Inc., 613 N.E.2d 159, 162 (N.Y. 1993)). Generally, a valid contractual modification "must satisfy each element of a contract, including offer, acceptance, and consideration." O'Grady v. BlueCrest Cap. Mgmt. LLP, 111 F. Supp. 3d 494, 502 (S.D.N.Y. 2015), aff'd, 646 F. App'x 2 (2d Cir. 2016) (citing Beacon Terminal Corp. v. Chemprene, Inc., 429 N.Y.S.2d 715, 718 (N.Y. App. Div. 1980)). Additionally, "[t]he course of conduct must evince a meeting of the minds in order to modify the [a]greement." O'Grady, 111 F. Supp. 3d at 502.

Moreover, a modification or amendment to a contract "establishes a new agreement between the parties which supplants the affected provisions of the underlying agreement while leaving the balance of its provisions unchanged." Baraliu v. Vinya Cap., L.P., No. 07 Civ. 4626, 2009 WL 959578, at *4 (S.D.N.Y. Mar. 31, 2009) (internal quotation marks

omitted) (quoting <u>Benipal v. Herath</u>, 674 N.Y.S.2d 815, 816 (N.Y. App. Div. 1998)).[14]

Here, the Court finds that the November 26 Modification constituted, at minimum, a valid modification of the oral Original Agreement. The November 26 Modification is a signed, handwritten document consisting of seven distinct clauses, numbered from "0" to "6" that provides a concrete repayment plan, connected to, but with some terms absent from, the Original Agreement. (<u>See</u> Pl. Ex. 103.) Daniloff and Zalko, on behalf of Daniloff, and Orkin, Bendersky, Saydam, and Gould, on behalf of Bloomfield, were present in Moscow to discuss the terms of this agreement, draft it, and sign it. The November 26 Modification, which was signed by all parties in attendance, outlined how Daniloff would repay the $25 million loan -- the underlying assumption upon which the parties were operating. Specifically, the document indicated that Daniloff would take the $25 million amount from a UMG bond drawdown, allowing Bloomfield to be repaid roughly by December 15, 2014. This repayment would be achieved through a "back-to-back"

---

[14] In New York, "subsequent contracts 'regarding the same subject matter supersede[] the prior contract,' even if there is no express termination, and even if the subsequent contract lacks an integration or merger clause." <u>Alessi Equip., Inc. v. Am. Piledriving Equip., Inc.</u>, 578 F. Supp. 3d 467, 502 (S.D.N.Y. 2022) (alterations in original) (quoting <u>Indep. Energy Corp. v. Trigen Energy Corp.</u>, 944 F. Supp. 1184, 1195 (S.D.N.Y. 1996)).

loan, and Daniloff would deposit the payment from UMG in a
bank account at DHB Bank in the Netherlands, over which
Bloomfield would have signatory control. (See id.) Saydam
testified at trial that Daniloff determined and suggested the
general structure of this repayment plan so that he could
"fulfill his obligations towards" Reuben. (Tr. at 544:1-9.)
The exact mechanics of repayment were not included in the
Original Agreement, so the Court is persuaded that the parties
sought to provide those details through modification to
reflect the changed circumstances since the parties shook
hands on Original Agreement.

Based on the evidence presented at trial, both the
Original Agreement and the November 26 Modification involved
the same transaction of $25 million loan transferred from
Bloomfield to Daniloff, and the November 26 Modification
provided a new date of December 15, 2014 for the repayment
deadline, waiving its previous deadline of December 2013,[15]

---

[15] The Court finds that the November 26 Modification effectively waived
the deadline for repayment imposed by the Original Agreement by
establishing a new repayment date of December 15, 2014. In New York, "[a]
party may, by words or conduct, waive a provision in a contract or
eliminate a condition which was inserted for [its] benefit." Am. Railcar
Indus., Inc. v. GyanSys, Inc., No. 14 Civ. 8533, 2017 WL 11501888, at *5
(S.D.N.Y. Nov. 14, 2017), aff'd, 764 F. App'x 57 (2d Cir. 2019)
(alterations in original and internal quotation marks omitted) (quoting
Oleg Cassini, Inc. v. Couture Coordinates, Inc., 297 F. Supp. 821, 830
(S.D.N.Y. 1969)). Further, New York courts have "held that a party, by
acquiescence or failure to pursue rights diligently under a time of the
essence provision, eliminates or waives the provision as a term or implied
term of the contract." Am. Railcar Indus., 2017 WL 11501888, at *5

and outlined steps for effectuating repayment of the loan provided.

Further, as the November 26 Modification was written and signed by the party to be bound, it did not require new consideration to constitute a valid modification. See Stralia Mar. S.A. v. Praxis Energy Agents DMCC, 431 F. Supp. 3d 366, 371 (S.D.N.Y. 2019) (noting that a modification to a valid contract does not require "additional consideration if the modification is 'in writing and signed by the party against whom it is sought to enforce the change [or] modification'") (quoting N.Y. Gen. Oblig. Law § 5-1103).

However, the parties dispute whether they intended to be bound by this document. To determine whether a binding contract or modification exists, a court must look to the intention of the parties, specifically "the parties' intent to be bound." Kreiss v. McCown DeLeeuw & Co., 37 F. Supp. 2d 294, 299 (S.D.N.Y. 1999) (citing R.G. Grp., Inc. v. Horn & Hardart Co., 751 F.2d 69, 74 (2d Cir. 1984)). The contracting parties are "free[] to determine the exact point at which an

---

(internal quotation marks omitted) (quoting Gould v. Bantam Books, Inc., No. 83 Civ. 5121, 1984 WL 684, at *4 (S.D.N.Y. 1984)). The Court finds that Bloomfield did not pursue its legal rights between the end of December 2013 and the execution of the November 26 Modification, and instead it imposed a new deadline for repayment pursuant to the November 26 Modification. Thus, the operative deadline for Daniloff's repayment of the loan became December 15, 2014.

agreement becomes binding." <u>Kreiss</u>, 37 F. Supp. 2d at 299. And "it is the intent of the parties that will determine the time of contract formation." <u>Winston</u>, 777 F.2d at 80; <u>see also</u> <u>Pues Fam. Tr. Ira v. Parnas Holdings Inc.</u>, 677 F. App'x 4, 5 (2d Cir. 2017) (finding that under New York law, "[t]he nature of [a loan] obligation depends upon the parties' intention") (alterations in original) (quoting <u>Brewster Transit Mix Corp. v. McLean</u>, 565 N.Y.S.2d 316, 316 (N.Y. App. Div. 1991)). However, "if either party communicates an intent not to be bound until he achieves a fully executed document, no amount of negotiation or oral agreement to specific terms will result in the formation of a binding contract." <u>Winston</u>, 777 F.2d at 80 (citing <u>R.G. Grp.</u>, 751 F.2d at 74).

At trial, Daniloff testified on cross examination that the November 26 Modification was "a list of discussion points" and not a binding agreement to repay Reuben. (Tr. at 438:5-17.) He contended that this agreement was not binding on the parties because of the presence of the open term in Clause 6, "Dan['s] Role sale/equity financial control" annotated with "Terms 2B proposed and agreed," which the Court recognizes is unequivocally an open term. (Pl. Ex. 103.)

Though a document may contain an open term, "the mere fact of open terms will not permit [the parties] to disavow

it." Tchrs. Ins. & Annuity Ass'n of Am. v. Tribune Co., 670
F. Supp. 491, 502 (S.D.N.Y. 1987). "The fact that countless
pages of relatively conventional minor clauses remained to be
negotiated does not render the agreement unenforceable." Id.
at 501; see also Shann v. Dunk, 84 F.3d 73, 79 (2d Cir. 1996)
("[A] court should consider the broad framework of a contract
in determining whether missing terms are actually essential
-- that is, necessary to make the agreement legally binding.").
Further, such disputed terms "are not to be considered in
isolation, but in the context of the overall agreement."
Tribune Co., 670 F. Supp. at 500. To determine the
enforceability of an open term, courts consider "expression[s]
of intent," id. at 499, "the context of the negotiations,"
id. at 500, the nature of the open terms, see id. at 501-02,
and "partial performance," id. at 502.

Here, despite the presence of the open term, the Court
finds that the November 26 Modification is binding because
the parties intended it to be so. At trial, Saydam testified
that the purpose of the meeting in Moscow on November 26,
2014, was to "[i]ron out all the details on how [Reuben would]
get repaid" (Tr. at 536:2) after months of unproductive
discussions with Daniloff to develop repayment structures.
Saydam testified that the terms were written down in order

"[t]o have a clear, clear, undeniable written agreement set . . . that will tell [them] how [they] are going to proceed." (Id. at 536:24-537:1.)

Clauses 0 through 5 clearly establish the terms of the agreement expressing repayment of the loan, how Bloomfield would be repaid, and by when. The open term in Clause 6 specifically concerned the role of Dan Gould, a banker who had been hired by Daniloff at Bloomfield's request. Orkin and Bendersky, who were present at the meeting, declared in their affidavits that they intended the document to be binding on the parties, and that the role of Gould was minor compared to the main purpose of the agreement, which was to establish how Daniloff would repay Bloomfield. (See Bendersky Decl. ¶¶ 22-24; Orkin Decl. ¶¶ 28-29.)

At trial, Saydam affirmed that the primary dispute regarding Gould's role was largely immaterial to the crux of the modification which was repayment of the $25 million loan. Gould was included in the November 26 Modification because he would act as the financial controller of the transaction *after* repayment had been achieved to ensure the success and survival of UMG given that Bloomfield was expected to still retain 25 percent control of the company. According to Saydam, Daniloff's main issue with Gould's role concerned the amount

72

of compensation he would receive, which resulted in the parties writing "Terms 2B proposed and agreed." (Pl. Ex. 103.)

As Bloomfield established at trial, the open term did not undermine the remaining provisions listed in the November 26 Modification. (See Tr. at 540:20-22.) Gould's role was not material or critical to enforcing the other terms because the parties expected repayment in "less than a month" following the November meeting in Moscow. Because Gould's role would become relevant "mostly subsequent to repayment" (Id. at 539:3-7), it did not comprise the "guts of the deal," Shann, 84 F.3d at 78, and concretizing this term would not be necessary to make the document legally binding.

After the modification had been signed by all in attendance in the meeting, Daniloff made no representations to Saydam or others in Reuben's party that the November 26 Modification was not binding. (See Tr. at 546:20-22.) Further, the parties took steps consistent with the November 26 Modification following that meeting. For example, in order to effectuate the terms of the agreement, the parties needed to follow the "Know Your Customer," or KYC procedure at DHB Bank, which required that Daniloff's passport be certified by the U.S. embassy. Daniloff emailed Saydam that he scheduled an appointment with the embassy, which indicated that he was

following DHB Bank's protocol in order to effectuate the
deposit of the repayment amount into DHB Bank, consistent
with the back-to-back loan noted in Clause 1 of the November
26 Modification. (See id. at 547:3-24; Pl. Ex. 108 at 3178.)

Additionally, on December 11, 2014, Reuben emailed
Daniloff to confirm that Daniloff "agreed and will transfer
25 m[illion] dollars that was taken by [him] from the escrow
account," reaffirming that Reuben is not an "investor in the
fund" and that he was supposed to "get paid back within two
years." (Pl. Ex. 107.) Daniloff responded, "I understand your
position very well and support it" and that he would return
the $25 million to Bloomfield. (Id.) Daniloff also sent an
email on January 1, 2015, referencing the November 26
Modification as "the transaction as agreed in Moscow" and
that "all parts of the agreement in Moscow must be completed."
(Pl. Exs. 104, 122.) Further, Daniloff acknowledged the terms
of the November 26 Modification (and the Original Agreement)
when he proposed to Orkin that he return $15 million instead
of the $25 million, a suggestion that Reuben promptly rejected.

Daniloff's conduct following the Moscow meeting, and
the parties' partial performance of the contract modification
indicate that the November 26 Modification was not merely a
list of discussion points but a binding modification of the

oral Original Agreement that governed the parties' conduct and the underlying $25 million transaction. Thus, the Court concludes that Bloomfield established that the November 26 Modification constitutes a binding, enforceable modification to the Original Agreement.

### 2. Bloomfield's Performance and Daniloff's Breach

The Court finds that Bloomfield has proved the remaining elements for breach of the oral Original Agreement and the subsequent modification in the form of the November 26 Modification. Having proven the existence of a contract in the form of the Original Agreement and a valid modification, Bloomfield has established that Bloomfield fully performed pursuant to the contract because it transferred the $25 million loan to the entity and by the process Daniloff specified in accordance with the parties' agreement. Bloomfield also took steps to set up a bank account first at ING Bank and then at DHB Bank over which it would have signatory authority.

Bloomfield likewise established that Daniloff breached the contract by failing to repay the $25 million loan first by the end of 2013 and then by the new repayment date of December 15, 2014 pursuant to the November 26 Modification, and by failing to obtain Reuben's authorization when he used

this money. Despite Bloomfield's extensions on repayment, Daniloff has failed to repay the $25 million loan in full.

### 3. Damages

The Court finds that Bloomfield has established damages because as of the date of this Decision and Order, Daniloff has not fully repaid the loan, causing damage to Bloomfield. In New York, "damages for breach of contract should put the plaintiff in the same economic position he would have occupied had the breaching party performed the contract." Oscar Gruss & Son, Inc. v. Hollander, 337 F.3d 186, 196 (2d Cir. 2003). As Bloomfield has established breach of contract, it "is entitled to recover compensatory damages, i.e., an amount which will restore the plaintiff to the same economic position she would have held but for the breach." Langenberg, 2006 WL 3518197, at *3 (citing Topps, 380 F. Supp. 2d at 261).

Bloomfield provided $25 million to Daniloff as a loan and expected the full amount to be repaid. On May 15, 2015, Daniloff caused a partial repayment of $2 million to Bloomfield. Then, on December 2, 2016, Daniloff partially repaid Bloomfield $4.5 million. Having repaid a total of $6.5 million to Bloomfield, Daniloff now owes $18.5 million to make Bloomfield whole.

Under New York law, "a plaintiff who prevails on a claim for breach of contract is entitled to prejudgment interest as a matter of right" pursuant to N.Y. C.P.L.R. Sections 5001 and 5002. U.S. Naval Inst. v. Charter Commc'ns, Inc., 936 F.2d 692, 698 (2d Cir. 1991). "An award of prejudgment interest is principally intended to compensate an aggrieved party for the wrongful deprivation of the use of its money." Quintel Corp., N.V. v. Citibank, N.A., 606 F. Supp. 898, 914 (S.D.N.Y. 1985) (citing Rolf v. Blyth, Eastman Dillon & Co., Inc., 637 F.2d 77, 87 (2d Cir. 1980)). The interest is calculated "from the earliest ascertainable date the cause of action existed." N.Y. C.P.L.R. § 5001(b). Further, "[w]here . . . damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date." Id. Such interest is awarded at a rate of nine percent per annum pursuant to N.Y. C.P.L.R. Section 5004. See Turner Const. Co. v. American Mfrs. Mut. Ins. Co., 485 F. Supp. 2d 480, 490 (S.D.N.Y. 2007).

Bloomfield argues that the earliest ascertainable date is January 1, 2014 because the loan was scheduled to be repaid

by the end of 2013.[16] The Court does not agree with Bloomfield that the interest should accrue from January 1, 2014. The parties executed the November 26 Modification, which effectively modified the terms of the Original Agreement, waiving the requirement that Daniloff repay the loan by the end of 2013 and resetting the deadline to December 15, 2014. Therefore, the breach of contract claim became actionable on December 16, 2014, when Daniloff failed to repay the loan by December 15, 2014. (See Pl. Ex. 103.)

Accordingly, the statutory prejudgment interest should be calculated from December 16, 2014 to the date of this Decision and Order, adjusted to the amounts remaining due on the loan. Specifically, the prejudgment interest shall be calculated as a statutory nine percent per annum interest on $25 million from December 16, 2014 until May 15, 2015; a nine percent per annum interest on $23 million from May 16, 2015 until December 2, 2016; and a nine percent per annum interest on $18.5 million from December 3, 2016 to the date of this Decision and Order.

---

[16] In New York, the statute of limitations for a breach of contract claim is six years. See N.Y. C.P.L.R. § 213(2). The limitations period begins to run when the cause of action accrues, which is at the time of breach. See N.Y. C.P.L.R. § 203(a); El-Cruikshank Co., Inc. v. Bank of Montreal, 615 N.E.2d 985, 986 (N.Y. 1993).

Further, Bloomfield seeks and is entitled to post-judgment interest on the full judgment amount[17] at the rate prescribed by 28 U.S.C. Section 1961(a) from the date of this Decision and Order, as calculated by the Clerk of Court. See 28 U.S.C. § 1961(a) ("Interest shall be allowed on any money judgment in a civil case recovered in a district court."); Cappiello v. ICD Publications, Inc., 720 F.3d 109, 112 (2d Cir. 2013) (holding that "under § 1961, federal district courts must apply the federal rate of post-judgment interest to judgments rendered in diversity actions").

Accordingly, Bloomfield has proven its breach of contract claims and is thus entitled to compensatory damages in the amount of $18.5 million plus prejudgment interest according to the calculation set forth above, and post-judgment interest on the full judgment amount pursuant to 28 U.S.C. Section 1961(a).

C.   PROMISSORY ESTOPPEL AND UNJUST ENRICHMENT

Bloomfield argues, in the alternative, that even if the Original Agreement and the November 26 Modification are not enforceable contracts, Bloomfield can recover under the

---

[17] The Court notes that the full judgment amount to which post-judgment interest applies includes punitive damages. See Koch v. Greenberg, 14 F. Supp. 3d 247, 287 (S.D.N.Y. 2014), aff'd, 626 F. App'x 335 (2d Cir. 2015) ("The postjudgment amount upon which the interest accrues includes compensatory damages, punitive damages, and fee awards.").

doctrines of promissory estoppel and unjust enrichment. Promissory estoppel and unjust enrichment are both quasi-contract claims that arise "in the absence of any agreement." Goldman v. Metro. Life Ins. Co., 841 N.E.2d 742, 746 (N.Y. 2005). In New York, a party may not recover under quasi-contract claims "if the parties have a valid, enforceable contract that governs the same subject matter" as the quasi-contract claims. Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168, 175 (2d Cir. 2005).

As the Court has determined that the Original Agreement is a valid enforceable contract and the November 26 Modification is a valid modification, both of which were breached, the Court need not reach these claims.

### III.    ORDER

For the reasons stated above, it is hereby

**ORDERED** that judgment shall be entered in favor of plaintiff Bloomfield Investment Resources Corporation ("Bloomfield") against defendant Elliot Daniloff ("Daniloff") on Bloomfield's fraudulent inducement and both breach of contract claims in the amount of $18.5 million for compensatory damages plus prejudgment interest calculated at a rate of nine percent per annum on $25 million from December 16, 2014 until May 15, 2015; nine percent per annum on $23

million from May 16, 2015 until December 2, 2016; and nine percent per annum on $18.5 million from December 3, 2016 to the date of this Decision and Order; $1 million in punitive damages; and post-judgment interest on the full judgment amount at the rate prescribed by 28 U.S.C. Section 1961(a) from the date of this Decision and Order, as calculated by the Clerk of Court; and it is further

**ORDERED** that within seven (7) days of the date of this Decision and Order, Bloomfield shall submit a proposed order of judgment that includes a calculation of its damages, prejudgment interest, and a provision for the imposition of post-judgment interest as detailed above; and it is further

**ORDERED** that Bloomfield may submit an application for reasonable attorneys' fees and costs pursuant to Rule 54(d) of the Federal Rules of Civil Procedure no later than June 6, 2023. Daniloff may respond to the application no later than June 13, 2023. And Bloomfield may file a reply no later than June 20, 2023.

**SO ORDERED.**

Dated:    23 May 2023
         New York, New York

Victor Marrero
U.S.D.J.

81